IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SMALL BUSINESS ASSOCIATION OF
MICHIGAN; CHALDEAN AMERICAN
CHAMBER OF COMMERCE;
STEWARD MEDIA GROUP, LLC;
POWER CONNECTIONS CO, LLC;
DEREK DICKOW; SEMPER REAL
ESTATE ADVISORS, LLC; and
TIMOTHY A. EISENBRAUN,

    Plaintiffs,      Case No. 1:24-cv-__314_____

vs.

JANET YELLEN, in her official capacity  Hon.
as the Secretary of the United States
Department of the Treasury; UNITED
STATES DEPARTMENT OF THE
TREASURY; and HIMAMAULI DAS, in
his official capacity as Acting Director of
the Financial Crimes Enforcement
Network,

    Defendants.

---

D. Andrew Portinga
Stephen J. van Stempvoort
Amanda L. Rauh-Bieri
MILLER JOHNSON
Counsel for Plaintiffs
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, Michigan 49503
(616) 831-1700
portingaa@millerjohnson.com
vanstempvoorts@millerjohnson.com
rauhbieria@millerjohnson.com

---

## **VERIFIED COMPLAINT**

  The Plaintiffs, Small Business Association of Michigan ("SBAM"),

Chaldean American Chamber of Commerce ("Chaldean Chamber"), Steward Media

Group, LLC, Power Connections Co, LLC, Derek Dickow, Semper Real Estate Advisors, LLC, and Timothy A. Eisenbraun, file this Complaint for declaratory judgment and injunctive relief to vindicate their rights and the rights of the members of SBAM and of the Chaldean Chamber (collectively, the "Members") under the United States Constitution, as detailed below:

## Preliminary Statement

1.      The federal Corporate Transparency Act (the "CTA" or the "Act"), requires a huge majority of entities that are formed under state law, whether or not they are engaged in any commerce at all, to report the "sensitive" personal information of their "beneficial owners" and "applicants" to the federal Financial Crimes Enforcement Network ("FinCEN"). The CTA defines "beneficial owner" as including anyone who "exercises substantial control over the entity," whether "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise." 31 U.S.C. § 5336(a)(3)(A). An "applicant" includes anyone who "files an application to form a corporation, limited liability company, or other similar entity under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(2)(A).

2.      Every covered entity must provide FinCEN with each beneficial owner's and applicant's name, date of birth, address, and unique identifying number, such as their passport number or drivers' license number. *See* 31 U.S.C. § 5336(b)(1)(A) & (2). The applicable regulations also require that FinCEN be provided a photograph of a corresponding identifying document—that is, of each beneficial owner's passport or drivers' license. *See* 31 C.F.R. § 1010.380(b)(1)(ii)(E). And the failure to do so carries substantial penalties. If any person willfully fails to

report or update their information as required by the CTA, they are subject to a $10,000 fine and two years' imprisonment. *See* 31 U.S.C. § 5336(h)(1) & (3).

3.     The CTA was enacted to make it easier for the federal government to combat financial crimes, like money laundering and terrorism funding. But it is bizarrely ill-suited to that stated purpose. For example, FinCEN has taken the position that small businesses must report the sensitive, personal information (including the passport photo) not only of the attorney who filed the paperwork to form the business but also of the clerk who works in the law firm's mailroom: "[A] mailroom employee at a law firm may physically deliver the document that creates a reporting company at the direction of an attorney at the law firm who is primarily responsible for decisions related to the filing. Both individuals are company applicants."[1] And, per the terms of the statute, the reports must be updated when there is any change in an applicant's or beneficial owner's personal information. This means that, under the statute, each of the law firm's clients would need to file updated reports if the law firm's mailroom clerk was issued a new driver's license, obtained a new passport, or got married and took her spouse's name. It is not clear how the lofty purposes of the CTA are measurably increased by exposing a small business owner to a felony prosecution for failing to advise FinCEN after its law firm's mailroom employee is issued a new driver's license.

---

[1] *See* Fin. Crimes Enforcement Network, *Beneficial Ownership Information Reporting Frequently Asked Questions*, at E.6., https://www.fincen.gov/boi-faqs#E_6.

4.     Instead of meaningfully advancing its stated goals, the CTA imposes significant burdens, especially on small businesses and their owners, investors, directors, and officers. The CTA's reporting requirements exempt any privately owned enterprise or business that has a place of business within the United States and has more than 20 full-time employees and more than $5 million in annual gross receipts or sales. *See* 31 U.S.C. § 5336(a)(11)(B)(xxi). In other words, the CTA's reporting requirements do not apply to large, publicly traded companies, who have the resources and sophistication to interpret and comply with complicated federal reporting regimes. Instead, the CTA is aimed directly at small businesses, like the majority of the members of SBAM and the Chaldean Chamber, many of whom are inordinately burdened by the CTA's novel requirements and vague test for determining "beneficial ownership." FinCEN estimates that, in 2024 alone, the aggregate cost of compliance with the CTA will be approximately $21.7 billion.[2] Much of this cost will be borne by small businesses alone.

5.     Along the way, the CTA treats millions of law-abiding United States citizens as if they are criminals, except without any reason to suspect that any of them have engaged in wrongdoing. Without any requirement for a warrant, court oversight, or even an opportunity for pre-compliance review by a neutral third party, the CTA compels innocent small business owners to involuntarily submit their sensitive personal information to a database that is compiled by criminal law

---

[2] *See* Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. 59573, available at https://www.federalregister.gov/d/2022-21020/p-958.

enforcement officers for the sole purpose of being better able to prosecute them. By ignoring the protections of the Fourth Amendment, the CTA allows a federal law enforcement agency to compel millions of American citizens to contribute their data to a database that can be leveraged against them in any future criminal investigation in which that information may become relevant or otherwise useful to law enforcement, regardless of whether the investigation is related to the money-laundering and terrorism-related impulses that gave rise to the CTA.

6.      Moreover, the sensitive personal information that is collected by FinCEN may be provided by FinCEN to any federal law enforcement agency in the United States upon request, as well as to any state law enforcement agency that has been authorized by any court officer to make such a request. *See* 31 U.S.C. § 5336(c)(2)(B)(i). And not only do domestic law enforcement agencies have ready access to this information, but FinCEN may also share this information—without any oversight or authorization from a United States court—with any federal agency who makes a request for the information on behalf of foreign government agencies who request assistance in an investigation or a prosecution in a foreign country. *See* 31 U.S.C. § 5336(c)(2)(B)(ii). In short, the CTA compels American citizens to disclose sensitive personal information under penalty of criminal punishment in order for the federal government to build a database of their private ownership interests, and then allows FinCEN to provide that sensitive information to state, federal, and foreign government law enforcement agencies without any prior suspicion of wrongdoing.

7.    The CTA may make it easier for law enforcement agencies to prosecute American citizens. But that does not mean that the courts can overlook its significant Constitutional flaws.

8.    First, because the CTA is triggered by the mere fact that an entity has been formed under state or tribal law, it applies to entities merely by virtue of their existence, not because they have engaged in any sort of commerce—interstate or otherwise. Congress's power under the Commerce Clause does not authorize it to regulate entities merely because they exist, irrespective of their impact on interstate commerce. Applying this logic, at least one federal court has already ruled that the CTA is not a proper exercise of Congress's authority over foreign affairs and national security interests, the Commerce Clause, or the taxation power. *See Nat'l Small Bus. United v. Yellen*, No. 5:22-CV-1448-LCB, 2024 WL 899372, at *1 (N.D. Ala. Mar. 1, 2024).

9.    The CTA, moreover, is primarily a law-enforcement tool. It compels law-abiding United States citizens to provide sensitive information to a federal law enforcement agency—which can be further shared with other domestic and even foreign law enforcement agencies—even though the federal government does not have any suspicion that any of these individuals is engaged in any wrongdoing. And the CTA allows all of this to occur without any court oversight over any step of the process. The Fourth Amendment does not allow the warrantless, suspicionless searches of American citizens and companies that the CTA authorizes wholesale.

10.    The CTA is also unconstitutionally vague. The CTA defines "beneficial owner" as including anyone who "exercises substantial control over the entity," whether "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise." 31 U.S.C. § 5336(a)(3)(A). American citizens are left to guess precisely how much control is "substantial" and which sorts of "relationships" or "otherwise" suffice to demonstrate the amorphous degree of "control" that will trigger a reporting obligation under the CTA. The CTA is too indefinite for ordinary people to know precisely when they are required to report an interest or not—that is, to know whether their conduct is criminal or not. Particularly because this sort of elastic definition (which is amplified rather than limited through FinCEN's rulemaking and interpretive guidance) increases prosecutorial discretion in the context of a statute that carries criminal penalties, the CTA bears all the hallmarks of an unconstitutionally vague statute.

11.    Under the applicable regulations, newly formed entities must begin complying with the CTA's reporting requirements on January 1, 2024, and existing entities must begin complying with them on January 1, 2025. For newly formed entities, the reporting deadline under the regulations is within 90 days of the date of the entity's formation. *See* 31 C.F.R. § 1010.380(a)(1)(i)(A).

12.    Notwithstanding the federal court's holding in *NSBU v. Yellen*, FinCEN has taken the position that the Plaintiffs do not come within the scope of

that court's judgment.[3] Absent prompt action from this Court, therefore, the Plaintiffs and the members of SBAM and the Chaldean Chamber will be required to disclose their sensitive information to FinCEN and will suffer irreparable harm through the deprivation of their constitutional rights. The Plaintiffs are entitled to preliminary and permanent injunctive relief enjoining the Defendants from enforcing the CTA against them.

## Jurisdictional Allegations

13.     Plaintiff Small Business Association of Michigan ("SBAM"), is a Michigan non-profit organization with a principal place of business in Lansing, Michigan.

14.     SBAM focuses on serving the needs of Michigan's small business community, particularly through advocacy and education on issues and policies pertaining to small businesses and small business regulation. SBAM's members are comprised of small businesses who are registered to do business in Michigan. SBAM currently has more than 30,000 small business members.

15.     A significant portion of SBAM's work involves advocating for the interests of its members, as well as educating its members and the Michigan small business community about federal and state legal and regulatory developments.

16.     SBAM's members include numerous reporting companies who are subject to the CTA's requirement that they turn over sensitive personal information

---

[3] *See* Fin. Crimes Enforcement Network, *UPDATED: Notice Regarding National Small Business United v. Yellen, No. 5:22-cv-01448 (N.D. Ala.)*, (March 11, 2024), available at https://www.fincen.gov/news/news-releases/updated-notice-regarding-national-small-business-united-v-yellen-no-522-cv-01448.

to the federal government about each of their beneficial owners. Many of SBAM's members are also concerned about which of their owners or non-owners may be deemed by FinCEN to exercise "substantial control" over a particular entity through an informal "relationship" or "otherwise," thereby potentially subjecting SBAM members and their individual owners and operators to criminal penalties under the CTA.

17.     Since the enactment of the CTA, SBAM has spent a considerable amount of time and resources educating its members about the requirements and implications of the CTA.

18.     For example, SBAM hosted a webinar on February 7, 2024 discussing "how to navigate the new [CTA]."[4]

19.     SBAM has also expended resources in posting news articles and updates about the CTA for its members on its website, as well as hosting a video about CTA compliance tailored to Michigan small business owners.[5]

---

[4]*See* Small Bus. Ass'n of Mich., *Webinar: Understanding the Corporate Transparency Act*, https://www.sbam.org/event/webinar-understanding-the-corporate-transparency -act/.
[5] *See* Small Bus. Ass'n of Mich., *Corporate Transparency Act*, (Dec. 22, 2023), https://www.sbam.org/corporate-transparency-act-2/; *see also* Small Bus. Ass'n of Mich., *Understanding the Corporate Transparency Act* (Jan. 18, 2024), https://www.sbam.org/understanding-the-corporate-transparency-act/; s*ee also* Small Bus. Ass'n of Mich., *Corporate Transparency Act And Beneficial Ownership* (Oct. 26, 2023), https://www.sbam.org/uncle-sam-wants-you/ ("Applying the "substantial control" test will be a complicated effort for many U.S. companies. Email or tweet me @fincenreport with your most challenging questions and I will do my best to find an answer in the FinCEN regulations.").

20.     The federal government has not extensively educated the public about the CTA or its disclosure requirements.

21.     As it has engaged in its education and advocacy efforts pertaining to the CTA, SBAM's experience has been that many small business owners in Michigan are unaware that the CTA exists, that it compels the onerous disclosure of sensitive information, and that it carries felony penalties for noncompliance. If the CTA is not enjoined, SBAM will be required to devote a substantially elevated level of resources into educating its members about compliance with the CTA. But for the CTA, SBAM would spend those resources on different issues pertaining to the Michigan small business community.

22.     SBAM has also fielded many inquiries from its members and other small business owners about the requirements of the CTA, including the requirement that entities report to FinCEN any person who exercises "substantial control" of an entity. Due to the imprecision of the relevant statutory terms, SBAM has diverted a substantial amount of time and resources to educating its members and responding to member inquiries pertaining to these provisions in the CTA, many of whom have expressed confusion with the requirements of the statute and the scope of the disclosures that are required.

23.     SBAM has diverted a substantial portion of its resources to address its members' inquiries and concerns pertaining to the vague provisions of the CTA. But for the CTA, SBAM would have used those resources in furtherance of

different educational and advocacy efforts pertaining to other, non-CTA issues affecting small businesses in Michigan.

24.    SBAM members also frequently form new Michigan companies to suit their operational needs. Many of those newly formed companies would be subject to the reporting requirements of the CTA.

25.    Plaintiff Chaldean American Chamber of Commerce (the "Chaldean Chamber") is a Michigan non-profit organization with a principal place of business in Farmington Hills, Michigan.

26.    The Chaldean Chamber exists to advocate and promote small businesses and economic opportunities, particularly in the context of businesses and individuals who are affiliated with the Chaldean American community. Chaldeans are Aramaic-speaking, Eastern Rite Catholics indigenous to Iraq. Since the United States' invasion of Iraq, more than three quarters of Iraq's Christian population (approximately 1,000,000 people) have fled Iraq due to religious persecution. The Chaldean Chamber has more than 4,000 businesses who are members of the Chamber.

27.    Many of the Chaldean Chamber's members are reporting companies who are subject to the CTA. In conjunction with other organizations, the Chaldean Chamber has been educating its members about their disclosure requirements under the CTA. But for the CTA, the Chaldean Chamber would have used these resources on advocacy, promotion, and education efforts on other issues of importance to its members that did not involve the CTA.

11

28. Plaintiff Steward Media Group, LLC is a Michigan limited liability company with its principal place of business located in Bloomfield Hills, Michigan. Steward Media Group is a member of both SBAM and the Chaldean Chamber. It is also a "reporting company" that is subject to the disclosure requirements under the CTA. As of the date of this complaint, Steward Media Group has not made the disclosures that are required under the CTA, and it objects to the compelled disclosures that it is or will be forced to make under the CTA. Because Steward Media Group was formed on February 24, 2011, its reporting deadline under the CTA is January 1, 2025.

29. Plaintiff Power Connections Co, LLC is a Michigan limited liability company with its principal place of business located in Bloomfield Hills, Michigan. Power Connections Co is a member of both SBAM and the Chaldean Chamber. Power Connections Co is a "reporting company" that is subject to the disclosure requirements under the CTA. As of the date of this complaint, Power Connections Co has not made the disclosures that are required under the CTA, and Power Connections Co objects to the compelled disclosures that it is or will be forced to make under the CTA. Because Power Connections Co was formed on March 15, 2024, its reporting deadline under the CTA is June 13, 2024.

30. Plaintiff Derek Dickow is a United States citizen and a resident of Birmingham, Michigan. Mr. Dickow owns a membership interest in Power Connections Co and in Steward Media Group. Both Power Connections Co and Steward Media Group are subject to the CTA's reporting requirements, neither of

12

them has yet made the required disclosures, and both of them object to the required disclosures. Mr. Dickow's sensitive personal information will be disclosed to FinCEN unless the Defendants are enjoined from enforcing the CTA. Mr. Dickow objects to being forced to comply with the CTA as a violation of his constitutional rights, including the right to be free from federal regulation that oversteps the constitutional bounds of Congress's federal powers. Mr. Dickow also objects to the fact that the CTA requires him not only to disclose personal information but to disclose it for long-term storage in FinCEN's law-enforcement database, from which FinCEN may share that information with other law enforcement and intelligence agencies around the world who ask for it. Mr. Dickow does not want his sensitive, personal information to be shared by FinCEN with other government actors, including federal, state, and foreign law enforcement officers, and Mr. Dickow would not voluntarily disclose this information to any of these officials absent compulsion under the CTA.  Mr. Dickow would comply with the CTA only because he would be forced to do so in order to avoid criminal penalties.

31.     Plaintiff Semper Real Estate Advisors, LLC is a Michigan limited liability company with its principal place of business located in Rochester, Michigan. Semper Real Estate Advisors is a member of SBAM. Semper Real Estate Advisors is a "reporting company" that is subject to the disclosure requirements under the CTA. As of the date of this complaint, Semper Real Estate Advisors has not made the disclosures that are required under the CTA, and it objects to the compelled disclosures that it is or will be forced to make under the CTA. Because Semper Real

Estate Advisors was formed on January 29, 2024, its reporting deadline under the CTA is Sunday, April 28, 2024.

32.     Plaintiff Timothy A. Eisenbraun is a United States citizen and a resident of Shelby Township, Michigan. Mr. Eisenbraun owns a membership interest in Semper Real Estate Advisors. Because Semper Real Estate Advisors is subject to the CTA's reporting requirements, Mr. Eisenbraun's sensitive personal information will be disclosed to FinCEN unless the Defendants are enjoined from enforcing the CTA. Mr. Eisenbraun objects to being forced to comply with the CTA as a violation of his constitutional rights, including the right to be free from federal regulation that oversteps the constitutional bounds of Congress's federal powers. Mr. Eisenbraun also objects to the fact that the CTA requires him not only to disclose personal information but to disclose it for long-term storage in FinCEN's law-enforcement database, from which FinCEN may share that information with other law enforcement and intelligence agencies around the world who ask for it. Mr. Eisenbraun does not want his sensitive, personal information to be shared by FinCEN with other government actors, including federal, state, and foreign law enforcement officers, and Mr. Eisenbraun would not voluntarily disclose this information to any of these officials absent compulsion under the CTA.  Mr. Eisenbraun would comply with the CTA only because he would be forced to do so in order to avoid criminal penalties.

33.     Defendant United States Department of the Treasury is an executive-branch department of the federal government headquartered in

Washington, D.C. responsible for the administration and enforcement of the CTA, through FinCEN.

34.     Defendant Yellen is the Secretary of the United States Treasury and is named as a party in her official capacity.

35.     Defendant Das is Acting Director of FinCEN and is named as a party in his official capacity.

36.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

37.     This Court has authority to render the requested injunctive relief because an "actual controversy" exists between the parties within the meaning of 28 U.S.C. § 2201(a).

38.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(3) because no real property is involved, Plaintiff SBAM resides in this District as do other officers and major shareholders of companies that are members of SBAM or the Chaldean Chamber, and Defendants are agencies or officers of the United States sued in their official capacities. *See* 28 U.S.C. § 1391(e)(1).

## General Allegations

## The Requirements of the CTA

39.     The CTA was enacted on January 1, 2021, as part of the omnibus National Defense Authorization Act for Fiscal Year 2021.  The stated purpose of the CTA is to combat money laundering, the financing of terrorism, and other illicit activity by cracking down on the use of anonymous "shell companies." To that end,

the CTA requires most United States corporate entities to provide extensive personal ownership information to FinCEN.

40.     The CTA requires "reporting companies" to provide to FinCEN data regarding each of its "beneficial owners" and (for entities formed after January 1, 2024) its "applicants." 31 U.S.C. § 5336(b)(1) & (2).

41.     Under the CTA, a "reporting company" is defined as a "corporation, limited liability company, or similar entity that is (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A).

42.     The CTA defines a "beneficial owner" as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" (i) "exercises substantial control over the entity;" or (ii) "owns or controls not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A).

43.     The CTA defines "applicant" as anyone who "files an application to form" a company under the laws of any state or Indian tribe, or who "registers or files an application to register" a foreign company to do business in the United States by filing a document with a "secretary of state or similar office" under the laws of a State or Indian tribe. 31 U.S.C. § 5336(a)(2).

44.     The CTA requires every reporting company to provide to FinCEN each beneficial owner's and each applicant's full legal name, date of birth, current residential or business street address, and "unique identifying number from an acceptable identification document," such as an unexpired passport or state-issued identification card or driver's license, or FinCEN-issued identifier number. 31 U.S.C. § 5336(b)(2)(A).

45.     The applicable regulations also require that FinCEN be provided a photograph of a corresponding identifying document—that is, of each beneficial owner's and applicant's passport or drivers' license. *See* 31 C.F.R. § 1010.380(b)(1)(ii)(E).

46.     Generally, this personal information must be reported to FinCEN within 30 days of the formation or registration of the reporting company. *See* 31 C.F.R. § 1010.380(a)(1)(i)(B). For reporting companies that are created on or after January 1, 2024 and before January 1, 2025, the information must be reported within 90 days of their formation. *See* 31 C.F.R. § 1010.380(a)(1)(i)(A). Reporting companies that were created before January 1, 2024 must report the information by January 1, 2025. *See* 31 C.F.R. § 1010.380(a)(1)(iii).

47.     If there are any changes to the reported data—such as if a "beneficial owner" moves their personal residence, is issued a new passport or driver's license, or gets married and changes their name—the entity must provide updated information to FinCEN within 30 days. *See* 31 C.F.R. § 1010.380(a)(2).

48.     Reporting companies that "willfully" fail to comply with the CTA's reporting requirements are subject to a civil penalty of up to $500 per day up to $10,000, two years' imprisonment, or both a fine and confinement. 31 U.S.C. § 5336(h)(1), (3).

49.     The disclosures required by the CTA will be used to create a database of personal information regarding "beneficial owners" and "applicants." 31 U.S.C. § 5336 note 7.

50.     The CTA requires FinCEN to keep the personal data of a reporting company's beneficial owners and applicants for at least five years after the date on which the reporting company is wound down. 31 U.S.C. § 5336(c)(1).

51.     FinCEN may share the reported personal data of reporting companies with federal, State, local, and tribal law enforcement agencies; with financial institutions for customer due diligence (with the reporting company's consent); and with "a Federal functional regulator or other appropriate regulatory agency," including foreign governmental agencies. 31 U.S.C. § 5336(c)(2)(B).

52.     If the request for personal data comes from a state, local, or tribal law enforcement agency, the CTA requires that it come through "appropriate protocols," and that "a court of competent jurisdiction, including any officer of such a court, has authorized the law enforcement agency to seek the information in a criminal or civil investigation." 31 U.S.C. § 5336(c)(2)(B)(i)(II).

53.     FinCEN may share the reported information without any court authorization if the request for the information comes from a "Federal agency

engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity." 31 U.S.C. § 5336(c)(2)(B)(i)(I).

54.     FinCEN may also share the reported information without court authorization if a federal agency makes a request for a beneficial owner or an applicant's personal data on behalf of a foreign law enforcement agency, prosecutor, or judge in connection with the foreign entity's "investigation or national security or intelligence activity." 31 U.S.C. § 5336(c)(2)(B)(ii).

55.     The CTA requires that relevant federal, state, and tribal agencies, as determined by the Secretary of the Treasury, must "cooperate with and provide information requested by FinCEN" to create and maintain the intended database of personal information. 31 U.S.C. § 5336(d)(2).

56.     The CTA provides that, as a condition of federal funding, "each State and Indian Tribe shall, not later than 2 years after the effective date of [FinCEN's reporting regulations]," notify reporting company filers of the personal-data reporting requirements and update relevant websites, instructions, and forms. See 31 U.S.C. § 5336(e)(2)(A).

**The CTA's Impact on Plaintiffs**

57.     FinCEN estimates that there are 32,556,929 entities that will meet the definition of a reporting company under the CTA as of 2024, excluding entities who are exempted from reporting. According to FinCEN, there will be

4,998,468 new entities per year that meet the definition of reporting company under the CTA, excluding exempted entities.[6]

58.    FinCEN estimates that each reporting company's cost of filing the initial beneficiary ownership interest report will range from $85.14 to $2,614.87, depending upon the complexity of the entity.[7]

59.    In the aggregate, FinCEN estimates that the cost of compliance with the CTA will be approximately $21.7 billion in 2024 and approximately $3.3 billion each year afterward.[8]

60.    The CTA excludes several categories of business entities and companies from its reporting requirements.

61.    One of the categories of companies excluded from the CTA includes companies that have (1) more than 20 full-time employees in the United States, (2) more than $5 million in gross receipts or sales, and (3) an operating presence at a physical office in the United States. 31 U.S.C. § 5336(a)(11)(B)(xxi).

62.    The CTA also excludes banks, insurance companies, investment funds, public companies, broker dealers, public accounting firms, money-transmitting businesses, existing shell companies with no foreign owners, assets, or active business, and "any entity or class of entities" that the Secretary of the Treasury

---

[6] Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. 59568 (2022), available at https://www.federalregister.gov/d/2022-21020/p-909.

[7] *See id.*, 87 Fed. Reg. 59573, available at https://www.federalregister.gov/d/2022-21020/p-958.

[8] *See id.*

determines by regulation, with the concurrence of the Attorney General and the Secretary of Homeland Security, should be exempt from reporting because the relevant beneficial ownership information would either not serve the public interest or would not be "highly useful" in aiding law enforcement efforts. 31 U.S.C. § 5336(a)(11)(B); *see* 31 U.S.C. § 5336(a)(11)(B)(xxiv).

63.     The CTA does not exempt reporting companies formed solely by United States citizens or permanent residents, including small businesses with 20 or fewer full-time employees and less than $5 million in gross receipts or sales.

64.     The CTA applies to reporting companies solely by virtue of the fact that they have been created under state law, irrespective of whether the reporting company engages in any activity, economic or otherwise.

65.     The CTA also applies to entities formed for strictly intrastate commerce or non-business purposes, such as entities formed to hold a family residence for estate-planning purposes, entities that are formed with the intent to seek 501(c) federal tax-exempt status but have not yet done so, or non-profit entities such as local private social clubs that do not intend to seek 501(c) federal tax-exempt status.

66.     The CTA does not contain any limitations that would restrict reporting obligations to individuals or entities that are suspected of a crime or wrongdoing.

67.     The CTA will have a substantial impact on the Plaintiffs, including the Members and similarly situated small business owners.

68.     The Plaintiffs and many of the Members are reporting companies, who are required to expend resources compiling and disclosing to FinCEN the information required under the CTA.

69.     The Plaintiffs and many of the Members will be required to determine which individuals qualify as "beneficial owners" under the vague terms of the CTA, including the CTA's provision that any individual who "indirectly" by any "understanding" "exercises substantial control" over an entity must be reported as a "beneficial owner." 31 U.S.C. § 5336(a)(3)(A).

70.     The CTA requires reporting companies to disclose to FinCEN information that most states do not currently require for entity formation in their respective jurisdictions. For example, Michigan law does not require birth dates or active passports, driver's licenses, or other such personal identification information for individuals who form an entity. For LLCs, Michigan law does not require disclosure of the identity of the LLC's members.  Likewise, for corporations, Michigan law does not require disclosure of the identity of the shareholders.

71.     Unlike under the CTA and its implementing regulations, Michigan law does not require any of the Plaintiffs or the Members to provide the government with updated address, passport, or driver's license information within 30 days of whenever it changed.

72.     For many of the Members, the costs of compliance with the CTA's requirements will be significant.

73.     Moreover, once the personal, sensitive information of the Plaintiffs and the beneficial owners of the Members is disclosed to FinCEN, that information may be shared with foreign and federal law enforcement agencies without any court oversight.

74.     The CTA contains no provisions to protect individuals who have formed or would form entities for associational or similar reasons but who have not yet applied for 501(c) federal tax-exempt status.

75.     Individuals who form or would form such entities are exercising their constitutionally protected free speech and association rights.

76.     The prospect of reporting their sensitive personal information to FinCEN may deter or chill such persons from participating in the management of the entity in a significant way and thereby risk being classified as a "beneficial owner" because of fear of exposure of their beliefs or activities.

## Causes of Action

### Count I

### Unconstitutional Regulation in Excess of Congress's Enumerated Constitutional Powers
### (U.S. Const. Art. I)

77.     Plaintiffs incorporate all preceding allegations.

78.     Under Article I of the Constitution, Congress has the power to regulate foreign, interstate, or Indian commerce.

79.     Congress has no regulatory interest or constitutional authority over corporate formation because a reporting company has not yet engaged in any foreign, interstate, or Indian commerce at the moment of its inception.

80.   The formation of an entity under state law is an entirely ministerial act, and many entities will engage in no activity until some indeterminate time after they have been formed.

81.   Michigan law, for example, allows individuals to form entities for any reason, not merely for the purpose of engaging in commercial activity.

82.   By imposing requirements on the mere act of entity formation without any relationship as to whether the formed entity will engage in commercial activity, the CTA exceeds Congress's power to regulate interstate, foreign, and Indian commerce.

83.   The CTA violates Plaintiffs' rights and the rights of the Members by imposing obligations on them in excess of Congress's enumerated powers set forth in Article I, Section 8 of the Constitution.

84.   The CTA is not a proper exercise of Congress's power under any other portion of Article I or any other provision of the Constitution.

85.   If the Defendants are not enjoined from requiring the Plaintiffs and the Members to make the compelled disclosures that the Defendants are unauthorized to require of them, the Plaintiffs will suffer irreparable harm.

86.   The Plaintiffs have no cause of action for damages and no adequate remedy at law for the Defendants' unauthorized conduct.

## Count II

### Unreasonable Search and Seizure
### (U.S. Const. amend. IV)

87.   Plaintiffs incorporate all preceding allegations.

24

88.     The CTA is a statute providing for criminal punishments enacted for the purpose of collecting sensitive personal information from individuals to create a database for law enforcement purposes by FinCEN and other United States and foreign law-enforcement and intelligence agencies.

89.     The Fourth Amendment prohibits law enforcement agencies from engaging in warrantless, suspicionless searches and compelled disclosures, particularly without court oversight and without any opportunity for pre-compliance review by a neutral third party.

90.     Privacy is often a key motivation in state entity formation.

91.     Michigan law does not require individuals who wish to form a corporate entity to provide their birth dates and personal identification numbers.

92.     The entity-formation laws in Michigan and other states reflect the states' judgment that individuals need not disclose sensitive information as a condition of forming corporate entities. Individuals who form an entity under such state laws have a reasonable expectation that their sensitive personal information will not be disclosed to a federal or a foreign law enforcement agency.

93.     The CTA's requirements violate individuals' reasonable expectations of privacy by compelling the disclosure of information that is protected by the Fourth Amendment without a warrant, without reasonable suspicion, and without any court oversight or an opportunity for pre-compliance review by a neutral third party.

94.    The CTA does not limit reporting entities' obligation to provide the required personal information to situations where there is an articulable, individualized suspicion of a crime or wrongdoing by such beneficial owners and applicants.

95.    The CTA also authorizes FinCEN to provide the Plaintiffs' and the Members' private, personal information to foreign governments, federal regulators, and regulatory agencies without any court authorization or specific requirements regarding those federal and foreign government agencies' need for the information.

96.    The CTA does not limit FinCEN's ability to share this personal information with other law enforcement agencies to situations where there is an articulable, individualized suspicion of a crime or wrongdoing by such beneficial owners and applicants.

97.    By requiring, under threat of criminal penalty, reporting companies to provide individuals' sensitive personal information for law enforcement purposes in the absence of specific prior indicia of wrongdoing, the CTA deprives Plaintiffs and the Members their privacy rights, and violates the Fourth Amendment of the Constitution of the United States.

98.    By compelling disclosures and permitting the release of sensitive personal data to federal and foreign law enforcement agencies without the reporting company's consent or authorization from a court of competent jurisdiction, the CTA violates the Fourth Amendment rights of the Plaintiffs and the Members.

99. If the Defendants are not enjoined from enforcing the CTA against the Plaintiffs and the Members, the Plaintiffs will suffer irreparable harm.

100. The Plaintiffs have no cause of action for damages and no adequate remedy at law for the Defendants' unauthorized conduct.

## Count III

### Unconstitutional Violation of Due Process – Void for Vagueness (U.S. Constitution, Amendment V)

101. Plaintiffs incorporate all preceding allegations.

102. Both the CTA and the FinCEN rules relating to the CTA fail to provide definitions specific enough for ordinary small businesses or non-business entities to understand what conduct is required to avoid criminal sanctions including, but not limited to, failing to sufficiently define "beneficial owner," "understanding," "relationship," "otherwise," and "substantial control."

103. The CTA requires the Plaintiffs and the Members to report information to FinCEN on pain of criminal penalty without providing them with adequate notice of when, for example, an individual may be deemed to have "substantial control" over a reporting entity. 31 U.S.C. § 5336(a)(3)(A)(i).

104. Nor does the CTA provide the Plaintiffs and the Members with adequate notice of which "understanding[s], relationship[s], or otherwise" may result in an individual being deemed to have "substantial control" over a reporting entity. 31 U.S.C. § 5336(a)(3)(A).

105. For example, it is unclear whether a reporting corporation must report the sensitive personal information of all or any of the members of its board of

directors, or whether specific directors need to be disclosed if, for example, they provide a tie-breaking vote on a matter pertaining to corporate governance.

106.    It is also unclear whether a reporting company must report the sensitive personal information of individuals who have some degree of informal input into the affairs of a small, family-owned business but who have no legal ownership or economic interest in the business.

107.    Instead of clarifying the ambiguity, the implementing regulations define "substantial control" as meaning, in part, "substantial control": "*Definition of substantial control.*   An individual exercises substantial control over a reporting company if the individual: . . . (D) Has any other form of substantial control over the reporting company." 31 C.F.R. § 1010.380(b)(1)(i)(D).

108.    Nor is it clear whether a reporting company may be criminally liable when a beneficial owner refuses to disclose the required information.

109.    The CTA provides that any "person" who willfully fails to report the required information "to FinCEN in accordance with subsection (b)" may be fined or imprisoned. 31 U.S.C. § 5336(h)(1), (3).

110.    Under the statutory text, only the entity—not the beneficial owner—is required to make the disclosure to FinCEN under subsection (b). 31 U.S.C. § 5336(b)(1)(A).

111.    Due to the textual ambiguity, if, for example, a shareholder who is a beneficial owner refuses to supply the required personal information to the company and the company thereby fails to comply with its reporting obligations

under the CTA, it is not clear under the CTA whether the beneficial owner, the entity, neither, or both has incurred criminal liability.

112.   FinCEN has issued FAQ responses suggesting—contrary to the statutory text—that (1) individual shareholders may have criminal exposure under the CTA for failing to provide information to a "reporting company" that is subject to the CTA,[9] and (2) a "reporting company" has the burden to force shareholders to provide this information, even if the company has no contractual or other legal right to receive it.[10]

113.   By subjecting the Plaintiffs, the Members, and all other individuals covered by the CTA to potential criminal sanctions without adequate notice of the actions required to avoid the sanctions, the CTA is unconstitutionally vague, in violation of the Due Process Clause of the Fifth Amendment.

114.   SBAM and the Chaldean Chamber have diverted significant resources fielding questions like these from the Members about the scope of the CTA.

115.   If the Defendants are not enjoined from enforcing the CTA against the Plaintiffs and the Members, the Plaintiffs will suffer irreparable harm.

---

[9] *See* Fin. Crimes Enforcement Network, *Beneficial Ownership Information Reporting Frequently Asked Questions*, at K.3., https://www.fincen.gov/boi-faqs#K_3 ("Both individuals and corporate entities can be held liable for willful violations.").

[10] *See id.*, at K.5., https://www.fincen.gov/boi-faqs#K_5 ("While FinCEN recognizes that much of the information required to be reported about beneficial owners and company applicants will be provided to reporting companies by those individuals, reporting companies are responsible for ensuring that they submit complete and accurate beneficial ownership information to FinCEN.").

116.    The Plaintiffs have no cause of action for damages and no adequate remedy at law for the Defendants' unauthorized conduct.

For the foregoing reasons, the Plaintiffs respectfully request that the Court enter a judgment against the Defendants and award Plaintiffs the following relief:

a.   A declaration that the CTA is unconstitutional on its face and as applied to the Plaintiffs and the Members because it exceeds Congress's enumerated powers under the Constitution;

b.   A declaration that the CTA is unconstitutional on its face and as applied to the Plaintiffs and the Members because it violates the Fourth Amendment;

c.   A declaration that the CTA is unconstitutional on its face and as applied to the Plaintiffs and the Members because it violates the Fifth Amendment;

d.   Preliminary and permanent injunctive relief preventing the Defendants and any other agency or employee acting on behalf of the United States from enforcing the CTA against the Plaintiffs and the Members;

e.   Preliminary and permanent injunctive relief preventing the Defendants and any other agency or employee acting on behalf of the United States from retaining, using, sharing, or disclosing for

any purpose any information pertaining to the Plaintiffs and the

Members that the Defendants obtain under the CTA;

f.   Costs and expenses of this action, including reasonable attorneys'

fees, including but not limited to attorneys' fees under 28 U.S.C.

§ 2412; and

g.   Any further relief that the Court deems appropriate.

MILLER JOHNSON
Counsel for Plaintiffs

Dated:  March 26, 2024          By /s/ Stephen J. van Stempvoort
D. Andrew Portinga
Stephen J. van Stempvoort
Amanda L. Rauh-Bieri
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, Michigan 49503
(616) 831-1700
portingaa@millerjohnson.com
vanstempvoorts@millerjohnson.com
rauhbieria@millerjohnson.com

31

## VERIFICATION

I, Brian Calley, declare as follows:

1. I am an adult competent to testify to the matters stated herein.
2. I am the President and CEO of the Small Business Association of Michigan ("SBAM"), and in that capacity, I am familiar with the business of SBAM, a Plaintiff in this action.
3. I have read the foregoing Verified Complaint and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint pertaining to SBAM and its members are true to the best of my knowledge and belief.
4. If called upon to testify, I would competently testify as to the matters stated herein.
5. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 3/25/2024

3" = "3" "MJ_DMS 37545063v1" "" MJ_DMS 37545063v1

## VERIFICATION

I, Martin Manna, declare as follows:

1. I am an adult competent to testify to the matters stated herein.

2. I am the Executive Director of the Chaldean American Chamber of Commerce (the "Chaldean Chamber"), a Plaintiff in this action, and in that capacity, I am familiar with the business of the Chaldean Chamber.

3. I have read the foregoing Verified Complaint and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint pertaining to the Chaldean Chamber and its members are true to the best of my knowledge and belief.

4. If called upon to testify, I would competently testify as to the matters stated herein.

5. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _3-26-24_____

## **VERIFICATION**

I, Timothy A. Eisenbraun, declare as follows:

1. I am an adult competent to testify to the matters stated herein;

2. I am a member of Semper Real Estate Advisors, LLC, a Plaintiff in this action, and in that capacity, I am familiar with the business of Semper Real Estate Advisors;

3. I have read the foregoing Verified Complaint and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint pertaining to me and Semper Real Estate Advisors are true to the best of my knowledge and belief.

4. If called upon to testify, I would competently testify as to the matters stated herein.

5. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____

March 25, 2024

Executed on: _____

## VERIFICATION

I, Derek Dickow, declare as follows:

1. I am an adult competent to testify to the matters stated herein;

2. I am a member of Steward Media Group, LLC, a Plaintiff in this action, and in that capacity, I am familiar with the business of Steward Media Group.

3. I am a member of Power Connections Co, LLC, a Plaintiff in this action, and in that capacity, I am familiar with the business of Power Connections Co.

4. I have read the foregoing Verified Complaint and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint pertaining to me, Steward Media Group, and Power Connections Co. are true to the best of my knowledge and belief.

5. If called upon to testify, I would competently testify as to the matters stated herein.

6. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _3/26/24_

MJ_DMS 37545067v1