**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

SMALL BUSINESS ASSOCIATION OF          )
MICHIGAN, *et al.*,                    )
                                       )
                    Plaintiffs,        )
                                       )
            v.                         )        Case No. 1:24-cv-314
                                       )
JANET YELLEN, in her official capacity as the )    Hon. Robert J. Jonker
Secretary of the United States Department of )
the Treasury, *et al.*,                )
                                       )
                    Defendants.        )

_____

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DIANE KELLEHER                     United States Department of Justice
Assistant Branch Director          Civil Division, Federal Programs Branch
                                   1100 L Street, N.W.
MICHAEL J. GAFFNEY                 Washington, D.C. 20005
CHRISTIAN S. DANIEL               Tel: (202) 514-2356
Trial Attorneys                    Email: michael.j.gaffney@usdoj.gov

                                   *Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    I.     Congress's Enactment of the Anti-Money Laundering Act and the CTA ............. 2

    II.    FinCEN's Rulemaking ........................................................................................... 6

    III.   Procedural History ................................................................................................ 7

LEGAL STANDARDS ....................................................................................................... 8

ARGUMENT ...................................................................................................................... 8

    I.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS .................. 8

         A.     The CTA Is Authorized by Congress's Enumerated Powers...................... 8

             i.      The CTA Is Authorized by Congress's Power to Regulate
                   Interstate and Foreign Commerce. .................................................... 9

             ii.     The CTA Is Authorized by Congress's Power to Regulate Foreign
                   Affairs and Ensure National Security. .......................................... 19

             iii.    The CTA Is Authorized by Congress's Power to Levy and Collect
                   Taxes. ............................................................................................ 21

         B.     The CTA Does Not Violate the Fourth Amendment ............................... 21

             i.      Plaintiffs Lack a Reasonable Expectation of Privacy as to
                   Information Subject to the CTA .................................................... 22

             ii.     The CTA's Reporting Requirements Are Reasonable under
                   the Fourth Amendment ................................................................. 25

         C.     The CTA Does Not Violate the Fifth Amendment ................................... 28

    II.    THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH
        AGAINST AN INJUNCTION ........................................................................... 32

CONCLUSION ................................................................................................................. 33

# INTRODUCTION

For decades, Congress has legislated to curb money laundering and terrorist financing. As illicit actors find new ways to circumvent those laws, Congress has responded to ensure that the government possesses the information to counteract such evolving threats. Most recently, these threats come from the exploitation of legal entities such as corporations to facilitate illicit activity that imperils the national security and foreign policy of the United States. Criminals, both domestic and international, can easily create these entities under state laws and may generally do so without disclosing their involvement. As a result, the United States has become a popular jurisdiction for such criminals to create legal entities that facilitate and further fraud, human smuggling, corruption, drug trafficking, and terrorist financing.

To better protect the U.S. financial system, Congress passed the Anti-Money Laundering Act of 2020, which includes the Corporate Transparency Act ("CTA"). This legislation requires certain companies to report information concerning their beneficial owners and those individuals filing certain entity-creation forms to the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury. Congress assessed that this information— including a beneficial owner's name, address, date of birth, and a unique identifier such as a driver's license number—will prove highly useful to law enforcement and the intelligence community's efforts to counter the threat posed by terrorists, proliferators, and others undermining U.S. interests.

Plaintiffs—Michigan-based business associations, their members, and business owners— challenge the CTA's constitutionality by asserting that the statute exceeds Congress's enumerated powers and violates the Fourth and Fifth Amendments. But they have not shown a likelihood of success on the merits of these claims because the CTA (1) falls well within Congress's power to regulate commerce, ensure national security, and levy and collect taxes; (2) does not unreasonably

invade any Fourth Amendment privacy interests; and (3) is sufficiently clear and definite as to defeat a void-for-vagueness claim. Nor does consideration of the remaining preliminary-injunction factors favor Plaintiffs. The Court should deny Plaintiffs' motion for preliminary injunction.

## BACKGROUND

### I. Congress's Enactment of the Anti-Money Laundering Act and the CTA

For decades, Congress has enacted legislation to curb money laundering and terrorist financing. *See, e.g.*, Bank Secrecy Act ("BSA"), Pub. L. No. 91-508 § 121, 84 Stat. 1114 (1970).[1] Despite these efforts, there remained a significant gap in the government's ability to detect and prosecute financial crime. Under state law, "corporations, limited liability companies, [and] other similar entities" are generally not required to disclose "information about the[ir] beneficial owners." National Defense Authorization Act ("NDAA"), Pub. L. No. 116-283, § 6402(2), 134 Stat. 3388, 4604 (2021). "A person forming a corporation or limited liability company within the United States" thus "typically provides less information at the time of incorporation than is needed to obtain a bank account or driver's license …." H.R. Rep. 116-227, at 2 (2019). That enables "malign actors" to "conceal their ownership of corporations" and then use those anonymous corporations to engage in "money laundering," "the financing of terrorism," and "serious tax fraud." NDAA § 6402(3).

Criminals routinely exploit this enforcement gap. Federal prosecutors report that "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies." Beneficial Ownership Information Reporting

---

[1] Parts of the Currency and Foreign Transactions Reporting Act of 1970, its amendments, and other statutes relating to the subject matter of that Act, are referred to as the BSA. The BSA is codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-60, and 31 U.S.C. §§ 5311-14 and §§ 5316-36, and includes notes thereto.

Requirements, 87 Fed. Reg. 59,498, 59,503 (Sept. 22, 2022).[2]  Likewise, drug traffickers "commonly use shell and front companies to commingle illicit drug proceeds with legitimate revenue of front companies, thereby enabling the [traffickers] to launder their drug proceeds." *Id*.

In addition to facilitating domestic crime, the absence of company ownership information threatens U.S. national security and foreign policy interests.  For instance, "Russian elites, state-owned enterprises, and organized crime, as well as the Government of the Russian Federation have attempted to use U.S. and non-U.S. shell companies to evade sanctions."  87 Fed. Reg. at 59,498.  The Government of Iran has similarly deployed shell companies "to obfuscate the source of funds and hide its involvement in efforts to generate revenue."  *Id*. at 59,502.

For similar reasons, criminals can use the government's lack of information about the ownership of corporations to obscure their income and assets and thus perpetrate "serious tax fraud."  NDAA § 6402(3).  Indeed, a "Treasury study based on a statistically significant sample of adjudicated IRS cases from 2016-2019 found legal entities were used in a substantial proportion of the reviewed cases to perpetrate tax evasion and fraud."  87 Fed. Reg. at 59,503.  Because it did not collect beneficial ownership information, the United States had fallen out of "compliance with international anti-money laundering and countering the financing of terrorism standards."  NDAA § 6402(5)(E).

To address this enforcement gap, Congress enacted ownership reporting requirements.  The Anti-Money Laundering Act of 2020 (AMLA) adopts various provisions designed to "modernize" federal "anti-money laundering" laws and those "countering the financing of terrorism."  NDAA § 6002(2).  Among those provisions is the CTA, which "establish[es] uniform beneficial

---

[2] "Shell companies" are entities "that have no physical presence beyond a mailing address, generate little to no independent economic value, and generally are created without disclosing their beneficial owners."  87 Fed. Reg. at 59,501.  Thus, shell companies "can be used to conduct financial transactions while concealing [the] true beneficial owners' involvement."  *Id*.

ownership information reporting requirements." *Id*. § 6402(5). In passing the AMLA and CTA, Congress explained that "Federal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States is needed," among other purposes, to "protect vital Unite[d] States national security interests," "protect interstate and foreign commerce," and "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity." *Id*. § 6402(5)(B)-(D). The Executive Branch agrees. *See* 87 Fed. Reg. at 59,498.

Under the CTA, each "reporting company" must disclose to FinCEN information about beneficial owners and applicants. 31 U.S.C. § 5336(b). A "reporting company" is "a corporation, limited liability company, or other similar entity that is … (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.* § 5336(a)(11)(A).

Congress exempted from the reporting requirements various categories of entities whose information would not facilitate the detection and prosecution of financial crime. The CTA excludes banks, public accounting firms, and other businesses already subject to reporting or recordkeeping requirements. *See* 31 U.S.C. § 5336(a)(11)(B). It excludes many domestically owned entities no longer engaged in business, which the statute generally defines in terms of whether an entity has been in existence for over a year but is "not engaged in active business" or "otherwise hold[ing] any kind or type of assets." *Id*. § 5336(a)(11)(B)(xxiii). It also excludes many trusts, political organizations, and non-profits. *See id*. § 5336(a)(11)(B)(xix). And it allows the government to exempt any other "entity or class of entities" for which "requiring beneficial

ownership information" would not "serve the public interest" and "would not be highly useful" in "efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, … or other crimes." *Id*. § 5336(a)(11)(B)(xxiv).

Congress has additionally defined "beneficial owner" as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise … (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A); *but see id.* § 5336(a)(3)(B) (exemptions). An "applicant" is the individual who files or directs the filing of documents to create the corporate entity or, if foreign, register it to do business in the United States. *Id.* § 5336(a)(2); 31 C.F.R. § 1010.380(e). To comply with its statutory obligations, a reporting company must report the beneficial owner's and applicant's legal name, date of birth, residential or business address, and "unique identifying number from an acceptable identification document." 31 U.S.C. § 5336(b)(2)(A); *see id.* § 5336(a)(1) ("[a]cceptable identification document" includes a passport or state-issued driver's license); 31 C.F.R. § 1010.380(b)(1)(ii)(E) (requiring submission of image of identifying document from which identifying number was obtained). If formed prior to January 1, 2024, a reporting company is not required to report applicant information, but it must provide beneficial ownership information by January 1, 2025. *Id.* § 5336(b)(1)(B); 31 C.F.R. § 1010.380(a)(1)(iii), (b)(2)(iv). Reporting companies formed during 2024 must provide beneficial ownership and applicant information within 90 days of notice of the entity's creation. 31 U.S.C. § 5336(b)(1)(C); 31 C.F.R. § 1010.380(a)(1)(i). For reporting companies created after 2024, compliance will be required within 30 days of notice of formation. 31 C.F.R. § 1010.380(a)(1)(i)(B). Reporting companies must also disclose changes to beneficial ownership or applicant information within 30 days. 31 U.S.C. § 5336(b)(1)(D); 31 C.F.R. § 1010.380(a)(2).

Willful reporting violations may lead to civil or criminal penalties.  31 U.S.C. § 5336(h); 87 Fed. Reg. at 59,545-47.

Congress ensured that FinCEN would appropriately maintain the reported information.  31 U.S.C. § 5336(c)(3), (8).  Such information is generally deemed "confidential and may not be disclosed" except as authorized by the CTA.  *Id.* § 5336(c)(2)(A).  For instance, FinCEN may disclose beneficial ownership information after receiving a request "from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity," or to "a State, local, or Tribal law enforcement agency, if a court of competent jurisdiction … has authorized the law enforcement agency to seek the information in a criminal or civil investigation."  *Id.* § 5336(c)(2)(B)(i).  In more limited circumstances, FinCEN may also disclose beneficial ownership information to "a Federal agency on behalf of a law enforcement agency, prosecutor, or judge of another country," or to "a Federal functional regulator or other appropriate regulatory agency."  *Id.* § 5336(c)(2)(B)(ii), (B)(iv), (C).  FinCEN may nonetheless reject requests, including for "good cause," *id.* § 5336(c)(6), and may suspend requesters from accessing the information, *id.* § 5336(c)(7).

## II.  FinCEN's Rulemaking

In accordance with the CTA, 31 U.S.C. § 5336(b)(1), FinCEN published an advance notice of proposed rulemaking and a notice of proposed rulemaking concerning the reporting of beneficial ownership information.  86 Fed. Reg. 17,557 (Apr. 5, 2021); 86 Fed. Reg. 69,920 (Dec. 8, 2021).  After "carefully review[ing] and consider[ing]" the hundreds of comments it received—"many" of which "expressed support for the CTA and the proposed regulations"—FinCEN issued its final rule in September 2022.  87 Fed. Reg. at 59,509.

In relevant part, the final rule further defines the terms "beneficial owner," "substantial control," "ownership interests," "company applicant," "domestic reporting company," and

"foreign reporting company." *Id.* at 59,525-33, 59,536-39; *see id.* at 59,561-62 (considering alternative definitions). In the agency's assessment, "applying the beneficial owner rules will be a straightforward exercise for many reporting companies," as many "will have relatively small numbers of (or no) employees or simple management and ownership structures." *Id.* at 59,529.

### III.     Procedural History

On March 26, 2024, Plaintiffs filed this action. Plaintiffs consist of two business associations (the Small Business Association of Michigan and the Chaldean American Chamber of Commerce), three companies who are members of one or both of those associations (Steward Media Group, LLC; Power Connections Co., LLC; and Semper Real Estate Advisors), and two of the companies' individual owners (Derek Dickow and Timothy A. Eisenbraun). Compl., ECF No. 1, PageID.8-14.[3] They allege that the three companies are subject to the CTA's reporting requirements, and will have to report information regarding the Plaintiff individuals. *See id.* Plaintiffs assert three claims. First, they claim that the CTA exceeds Congress's enumerated powers. *Id.* ¶¶ 83-84, PageID.24. Second, they claim that the reporting requirements of the CTA constitute "warrantless, suspicionless searches" that violate the Fourth Amendment. *Id.* ¶ 89, PageID.25. Third, they claim that "the CTA is unconstitutionally vague, in violation of the Due Process Clause of the Fifth Amendment." *Id.* ¶ 113, PageID.29.

Also on March 26, Plaintiffs filed a Motion for Preliminary Injunction. *See* ECF No. 10. Plaintiffs stated that "[e]xpedited consideration of this motion is necessary" because one set of Plaintiffs—Semper Real Estate Advisors and its member, Timothy A. Eisenbraun—is required to disclose information under the CTA "on or before April 28, 2024," and certain others "on or before June 13, 2024." *Id.* at PageID.53. Plaintiffs do not assert that any of the organizational Plaintiffs,

---

[3] The government's description of Plaintiffs' allegations is not a concession that such allegations are adequately pleaded or true.

or their other members, require expedited relief.  *Id.*  Plaintiffs do not request nationwide relief, but rather "an order enjoining the Defendants from … enforcing the [CTA] against the Plaintiffs" or from "retaining or using" information about Plaintiffs acquired under the CTA.  *Id.*  On April 4, the parties submitted a stipulated scheduling order.  ECF No. 15.  The Court entered the scheduling order, reserving ruling on Plaintiffs' expedition request.  ECF No. 16.

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary and drastic remedy" that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (quotation omitted).  The movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[4]

## ARGUMENT

## I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A.  The CTA Is Authorized by Congress's Enumerated Powers.

Plaintiffs' enumerated-powers claim fails on three independent grounds.  First, the CTA fills a critical gap in a comprehensive scheme to prevent harmful economic activity and it directly regulates commercial enterprises, and is thus authorized by both the Commerce and Necessary and Proper Clauses.  Second, the CTA is a proper exercise of Congress's authority to regulate foreign

---

[4] Plaintiffs quote pre-*Winter* Sixth Circuit cases from the 1970s for the proposition that they need only raise "a fair ground for litigation" on the first factor.  Pls.' Br. in Supp. of Mot. for Prelim. Inj. ("PI Br."), ECF No. 11, PageID.71-72.  Whatever this little-used formulation means, the Sixth Circuit has since clarified that the movant must show "a strong likelihood of success on the merits," which is "more than a mere possibility of success."  *Ne. Ohio Coal. For Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quotation omitted); *see also NAACP v. City of Mansfield*, 866 F.2d 162, 169-70 (6th Cir. 1989) ("[W]e reiterate that the demonstration of a mere 'possibility' of success on the merits is not sufficient, and renders the test meaningless." (quotation omitted)).

affairs and ensure the nation's security. Third, the CTA is necessary to prevent bad actors from frustrating the government's ability to lay and collect taxes. Any of these bases suffices to defeat Plaintiffs' enumerated-powers challenge, and Plaintiffs have thus failed to "establish that no set of circumstances exists under which the Act would be valid." *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully …."); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 562 (2012) (op. of Roberts, C.J.) ("*NFIB*") (considering independent bases for upholding individual responsibility payment). Because Plaintiffs have not "clearly demonstrated" that Congress lacked the constitutional authority to pass the CTA, *see NFIB*, 567 U.S. at 538, Plaintiffs fall well short of establishing a likelihood of success on Count One. *See* Compl. ¶¶ 77-86, PageID.23-24.

### i. The CTA Is Authorized by Congress's Power to Regulate Interstate and Foreign Commerce.

The Constitution grants Congress the power to "make all Laws which shall be necessary and proper" to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8. It is "well established that Congress has broad authority under the [Commerce] Clause." *NFIB*, 567 U.S. at 549. That authority includes the "power to enact 'all appropriate legislation' for 'its protection and advancement'; to adopt measures 'to promote its growth and insure its safety'; 'to foster, protect, control and restrain.'" *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36-37 (1937) (citations omitted). In addition to regulating the "channels of interstate commerce" and "the instrumentalities of interstate commerce, and persons or things in interstate commerce," Congress may "regulate activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005); *see also Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 541 (6th Cir. 2011) (describing the "three broad spheres" of Commerce Clause authority), *abrogated on other grounds by NFIB*, 567 U.S. 519.

Congress may take all steps necessary and proper to regulate those activities that

substantially affect interstate commerce. While the federal government is one of enumerated powers, "'a government, entrusted with such' powers 'must also be entrusted with ample means for their execution.'" *United States v. Comstock*, 560 U.S. 126, 133 (2010) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 408 (1819)). Accordingly, the "Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority"—including the Commerce Clause—"are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive, to the authority's beneficial exercise.'" *Id.* at 133-34 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 413, 418).

A court may "only invalidate a congressional enactment passed pursuant to the Commerce Clause if it bears no rational relation to interstate commerce." *United States v. Faasse*, 265 F.3d 475, 481 (6th Cir. 2001). Accordingly, "[i]n assessing the scope of Congress' authority under the Commerce Clause," the Court's "task" is a "modest one." *Raich*, 545 U.S. at 22. The Court "need not determine whether [Plaintiffs'] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.*

The CTA's reporting requirements are authorized by the Commerce and Necessary and Proper Clauses. "Congress's power to regulate activities that substantially affect interstate commerce" allows Congress "to regulate two related classes of activity." *Thomas More L. Ctr.*, 651 F.3d at 541-42. First, Congress may "regulate even non-economic intrastate activity if doing so is essential to a larger scheme that regulates economic activity." *Id.* at 542; *see also Raich*, 545 U.S. at 18 ("Congress can regulate purely intrastate activity that is not itself 'commercial' … if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity."). Second, "Congress may regulate economic activity, even if wholly intrastate, if it substantially affects interstate commerce." *Thomas More L. Ctr.*, 651 F.3d at 542.

The CTA falls comfortably within both categories. First, the CTA's reporting requirements are a key component of the government's comprehensive anti-money laundering regulatory regime. Second, the CTA directly regulates economic activity that substantially affects interstate commerce.

**a.** The CTA's reporting requirements form a critical part of the federal government's comprehensive anti-money laundering regime. "[M]oney laundering is a quintessential economic activity." *See United States v. Goodwin*, 141 F.3d 394, 399 (2d Cir. 1997). "Money laundering harms society by 'disbursing capital from lawfully operating economic institutions to criminals in and out of the country.'" *United States v. Gonikman*, 2012 WL 1893501, at *2 (E.D. Mich. May 23, 2012) (quoting *United States v. Beddow*, 957 F.2d 1330, 1339 (6th Cir. 1992)). Plaintiffs do not dispute that Congress may, pursuant to the Commerce Clause, prohibit money laundering and other harmful forms of economic activity. *See* 18 U.S.C. §§ 1956, 1957 (prohibiting money laundering); *id.* § 2339C (prohibiting financing for terrorism); 26 U.S.C. § 7201 (prohibiting tax evasion). "Indeed, it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity." *Goodwin*, 141 F.3d at 399.

Various economic crimes—including money laundering, terrorism financing, and tax fraud—are made possible through the formation of various corporate entities which may conduct economic transactions in their own names without disclosing "information about the[ir] beneficial owners." NDAA § 6402(2). As Congress determined, "malign actors" can thus "conceal their ownership of corporations" and use them to conduct illicit transactions without detection. *Id*. § 6402(3). "This lack of transparency" has been "a primary obstacle to tackling financial crime in the modern era." H.R. Rep. 116-227, at 10. When investigators trace illicit funds to a corporation or similar entity, they often find that corporate ownership records are not "attainable because they do not exist." 87 Fed. Reg. at 59,504. Many criminals exploit this enforcement gap: "large-scale

schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies," and drug traffickers "commonly use shell and front companies to commingle illicit drug proceeds with legitimate revenue of front companies, thereby enabling the [traffickers] to launder their drug proceeds." *Id.* at 59,503.

To combat these economic crimes and the misuse of the instrumentalities and channels of interstate and foreign commerce, Congress passed the AMLA. The AMLA, of which the CTA is a part, aims "to modernize" existing federal legislation seeking to combat "money laundering and counter[] the financing of terrorism." NDAA §§ 6001, 6002(2), 6401.

The CTA fills an important gap in Congress's comprehensive regime to prevent money laundering by establishing "uniform beneficial ownership information reporting requirements." *Id*. § 6002(5). In particular, the statute requires corporate entities—that is, those entities that have the ability to engage in commercial transactions in their own name—to disclose the identities of the individuals who created the entities and have authority to direct their operations.

Congress determined that this information "is needed" to "protect interstate and foreign commerce" and "counter money laundering, the financing of terrorism, and other illicit activity." NDAA § 6402(5). Congress further determined that this information would "discourage the use of shell corporations as a tool to disguise and move illicit funds" and "assist national security, intelligence, and law enforcement agencies with the pursuit of crimes." *Id*. § 6002(5). These congressional findings rest on an extensive legislative record that demonstrated that "efforts to investigate corporations and limited liability companies suspected of committing crimes have been impeded by the lack of available beneficial ownership information." H.R. Rep. 116-227, at 2.

Failure to include the CTA in the AMLA would have left a "gaping hole" in Congress's anti-money laundering efforts. *See Raich*, 545 U.S. at 22. "[I]f left unregulated in the aggregate," the absence of corporate reporting requirements "could work to undermine Congress's ability to

regulate [a] larger interstate commercial activity"—*e.g.*, money laundering, terrorism financing, and tax evasion. *United States v. Bowers*, 594 F.3d 522, 529 (6th Cir. 2010) (holding that Commerce Clause allows regulation of non-commercial activity if failure to do so would undercut ability to enforce comprehensive regulatory regime).

Plaintiffs do not contest that the CTA is an essential part of Congress's comprehensive, anti-money laundering regulatory regime—although one district court has concluded otherwise. *See Nat'l Small Bus. United v. Yellen* ("*NSBU*"), 2024 WL 899372, at *17 (N.D. Ala. Mar. 1, 2024), *appeal filed*, No. 24-10736 (11th Cir. Mar. 11, 2024). That decision, which the government has appealed, acknowledged that "Congress has substantial leeway to regulate purely intrastate activity (whether economic or not) that it deems to have the capability, in the aggregate, of frustrating the broader regulation of interstate economic activity." *Id.* at *16 (cleaned up). But that district court nonetheless concluded that the CTA was an isolated, "single-subject statute" such that the "'comprehensive regulatory scheme' framework" did not apply. *Id.* at *17. Plaintiffs do not press that argument, which misunderstands the CTA's role as an important part of the AMLA. Nor do Plaintiffs assert, as the *NSBU* court held, that the "CTA is far from essential" on the basis that certain financial institutions are required to retain certain beneficial-owner information about their customers pursuant to a 2016 rule. *See id.* (citing 31 C.F.R. § 1010.230(a)). The *NSBU* court failed to appreciate two aspects of the 2016 rule that led Congress to reasonably determine, on an extensive record, that the CTA's disclosure requirements remained "needed" to combat economic crimes, notwithstanding the 2016 rule. NDAA § 6402(5); *see also* 87 Fed. Reg. at 59,548 (explaining how Congress addressed relationship between the CTA and the 2016 rule). First, the 2016 rule only applies to entities that choose to become customers of a comparatively narrow set of institutions. *See* 31 C.F.R. § 1010.605(e) (defining "covered financial institutions").

Second, the rule required those institutions to retain, but not transmit to the government for law enforcement purposes, certain customer information.

Because the CTA's reporting requirements are a critical "part of a larger comprehensive scheme to regulate [the] illicit interstate market" of money laundering and other economic crimes, Congress had authority to enact the CTA under the Commerce Clause and the Necessary and Proper Clause. *Bowers*, 594 F.3d at 528.

**b.** The CTA is authorized by the Commerce Clause for another, independent reason: the CTA itself regulates economic activity with a substantial effect on interstate commerce. After all, the CTA applies to corporations and other entities legally authorized to conduct commercial transactions, and it excludes from its reach many non-profits and domestically owned entities that are no longer "engaged in active business" or "otherwise hold[ing] any kind or type of assets." 31 U.S.C. § 5336(a)(11)(xix), (xxiii).

Plaintiffs disagree, asserting that Congress has exceeded its authority under the Commerce Clause because the CTA applies to "a reporting company" "at the moment of its inception" at a time when the company "has not yet engaged in any foreign, interstate, or Indian commerce." Compl. ¶ 79, PageID.23; *see also* PI Br., PageID.64 (arguing that the CTA is not authorized by the Commerce Clause because the "reporting requirement kicks in the moment that an entity is formed").

Plaintiffs mischaracterize the CTA as having nothing to do with commercial activity, as if the act of incorporation bears no rational connection to such activity. But it is hardly speculative that entities that incur the trouble and expense of filing papers to obtain authority to conduct commercial transactions in their own name go on to engage in commercial activity. For that reason, the CTA applies to a class of entities that can be used to conduct and conceal illicit transactions—namely, domestic corporations that are incorporated under state law or foreign

entities that obtain permission from a state to engage in business in the United States, *see* 31 U.S.C. § 5336(a)(11). The universe of entities subject to the CTA's reporting requirements—which excludes many trusts, political organizations, and non-profits, as well as many entities that are no longer "engaged in active business" or "otherwise hold[ing] any kind or type of assets," 31 U.S.C. § 5336(a)(11)(B)(xix), (xxiii)—confirms that the statute is a constitutional, commercial regulation. The reporting requirements thus govern entities with both the power and the purpose of conducting the types of commercial transactions that concerned Congress.

Plaintiffs' focus on edge cases and possible exceptions therefore misses the forest for the trees. While Plaintiffs hypothesize that the CTA could reach other entities, that speculative possibility is insufficient to invalidate an act of Congress. *See* PI Br., PageID.83 (referring to "[s]ome" undefined number of entities that could be "created, left on a shelf, and never used to hold any asserts or conduct any activity"). For one, *all* of the Plaintiffs in this action are themselves engaged in commerce. *See* Compl. ¶ 14, PageID.8 (SBAM "focuses on serving the needs of Michigan's small business community"); *id.* ¶ 26, PageID.11 (the Chaldean American Chamber of Commerce "exists to advocate and promote small businesses and economic opportunities"); Verification of Derek Dickow, ¶¶ 2-3, PageID.35 ("I am familiar with the business of Steward Media Group" and "the business of Power Connections Co."); Verification of Timothy A. Eisenbraun, ¶ 2, PageID.34 ("I am familiar with the business of Semper Real Estate Advisors"). Because Plaintiffs conduct commercial activity, they cannot rest their claim on a theory that the CTA might apply to a hypothetical entity that does not exist. *See Sabri v. United States*, 541 U.S. 600, 609 (2004) (rejecting overbreadth challenge when challenging parties "were well within the limits of legitimate congressional concern").

"[L]aws should not be invalidated by 'reference to hypothetical cases,'" *id.* at 608 (quotation omitted), and the Court has "never required Congress to legislate with scientific

exactitude," *Raich*, 545 U.S. at 17. Rather, "[w]hen the larger 'general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.'" *Bowers*, 594 F.3d at 528 (quoting *Raich*, 545 U.S. at 17). That is especially so where, as here, the "'total incidence' of a practice"—the formation of entities that may engage in commercial activity while hiding the identities of their beneficial owners—"poses a threat to a national market." *Raich*, 545 U.S. at 17.

Finally, Plaintiffs argue that the CTA improperly regulates "[c]orporate formation," which Plaintiffs say "is quintessentially a zone of state" regulation. PI Br., PageID.84 (citing *NSBU*, 2024 WL 899372, at *8). But the CTA does not purport to override or preempt any state-law incorporation provisions. *See NSBU*, 2024 WL 899372, at *8 ("To be sure, the CTA is not a direct regulation of corporate formation."). Instead, the CTA refers to businesses "created by the filing of a document with a secretary of state" as a means of identifying entities with authority to perform economic transactions in their own name, 31 U.S.C. § 5336(a)(11), and that can accordingly be used by "malign actors" to perpetrate "money laundering," "the financing of terrorism," and other crimes without disclosing the owners, NDAA § 6402(3). Entity formation is a necessary predicate to the application of the CTA's reporting requirements, but it is not itself an object of the CTA.

**c.** The cases relied on by Plaintiffs and the *NSBU* district court—*Morrison*, *Lopez*, and *NFIB*—stand in stark contrast to this one. *See NFIB*, 567 U.S. 519; *United States v. Morrison*, 529 U.S. 598 (2000); *United States v. Lopez*, 514 U.S. 549, 561 (1995). First, neither *Lopez* nor *Morrison* involved a comprehensive regulatory regime. *See Raich*, 545 U.S. at 39 (Scalia, J., concurring in the judgment) ("[N]either case involved the power of Congress to exert control over intrastate activities in connection with a more comprehensive scheme of regulation."). Here, the CTA—enacted as part of the AMLA—is a critical component of Congress's broader efforts to prevent misuse of interstate and foreign commerce. Second, in *Lopez* and *Morrison*, the Court

was distinguishing laws that (i) regulate activity with an "apparent commercial character," *Morrison*, 529 U.S. at 611 & n.4, from those which (ii) regulate activity which has "nothing to do with 'commerce' or any sort of economic enterprise," *Lopez*, 514 U.S. at 561, and which are "not, in any sense of the phrase, economic activity," *Morrison*, 529 U.S. at 613.  The CTA—which requires disclosure by those entities with legal authority to conduct commercial transactions—falls squarely on the "apparent commercial character" side of the line.

Plaintiffs' reliance on *NFIB* is equally misplaced.  In *NFIB*, the Court explained that Congress "has never attempted to rely on [the Commerce Clause] to compel individuals not engaged in commerce to purchase an unwanted product."  567 U.S. at 549.  Here, Congress is not regulating any entity because of its inactivity.  Congress is doing just the opposite, regulating a class of entities that have taken the affirmative step of incorporating or registering to do business.  Further, unlike the "novelty" of the regulation in *NFIB*, *see id.*, "[r]egulation requiring the submission of information" is a "familiar category" of federal legislation, *Elec. Bond & Share Co. v. SEC*, 303 U.S. 419, 437 (1938).  *See, e.g.*, 26 U.S.C. § 6012 (requiring taxpayers to file tax returns); 31 U.S.C. § 5311 *et seq.* (requiring banks to report information about certain transactions).

**d.**  The CTA is further authorized by the Commerce Clause because it regulates the channels of, and entities in, interstate commerce.  "Congress, of course, has undoubted power under the [C]ommerce [C]lause to impose relevant conditions and requirements on those who use the channels of interstate commerce so that those channels will not be conduits for promoting or perpetuating economic evils."  *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 99 (1946); *see also N. Am. Co. v. SEC*, 327 U.S. 686, 705-06 (1946).  "Thus to the extent that corporate business is transacted through such channels, affecting commerce in more states than one, Congress may act directly with respect to that business to protect what it conceives to be the national welfare," and

"[i]t may prescribe appropriate regulations and determine the conditions under which that business may be pursued." *Am. Power & Light Co.*, 329 U.S. at 99-100; *see also United States v. Orito*, 413 U.S. 139, 144 (1973). Entities constituting CTA reporting companies utilize the channels of interstate commerce, including telecommunications and electronic bank routing systems. NDAA §§ 6002, 6402. Plaintiffs assert that the CTA does not, on its face, target the "channels" or "instrumentalities" of interstate commerce, but they do not address the argument that Congress can impose conditions and requirements on those who use the channels of interstate commerce. *See* PI Br., PageID.81. As the foregoing cases explain, Congress's power to regulate interstate commerce extends beyond directly regulating telecommunications and banking networks, and includes the power to regulate those entities who seek to misuse those channels to commit economic crimes.

**e.** For the same reasons, the CTA is authorized by the Foreign Commerce Clause. "The plenary authority of Congress to regulate foreign commerce, and to delegate significant portions of this power to the Executive, is well established." *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 59 (1974) (citations omitted). The "Founders intended the scope of the foreign commerce power to be … greater" than the interstate commerce power. *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 (1979); *but see United States v. Rife*, 33 F.4th 838, 844 (6th Cir.) (declining to apply substantial-effects test in context of Foreign Commerce Clause). Regardless of the outer bounds of the Foreign Commerce Clause, it includes, at a minimum, "the power to punish acts that 'interfere with, obstruct, or prevent the due exercise of the power to regulate commerce and navigation with foreign nations, and among the states.'" *Rife*, 33 F.4th at 844 (quoting *United States v. Coombs*, 37 U.S. 72, 78 (1838)).

Here, Congress expressly found that the CTA "is needed to … protect … foreign commerce." NDAA § 6402(5)(C). The legislative record confirms that foreign actors are

engaging in illicit activity by exploiting lax beneficial ownership reporting requirements within the United States. *E.g.*, 166 Cong. Rec. at S7310 (statement of Sen. Brown) (noting such activity by shell companies with "foreign owners from China, North Korea, and other countries"); 166 Cong. Rec. at H6932 (statement of Rep. McHenry) ("[B]ad actors and nation states, such as China and Russia, are becoming more proficient in using our financial system to support illicit activity."); *Beneficial Ownership: Fighting Illicit International Financial Networks Through Transparency: Hearing before the Senate Judiciary Comm.*, 115th Cong. (2018) (statement of Sen. Grassley) ("Bad actors from all over the world have come to the U.S. as their financial safe haven."). The CTA is therefore further authorized by the Foreign Commerce Clause.

### ii. The CTA Is Authorized by Congress's Power to Regulate Foreign Affairs and Ensure National Security.

The CTA also aids the enforcement of prohibitions designed to protect U.S. foreign policy and national security interests. "Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963); *see also Hernandez v. Mesa*, 140 S. Ct. 735, 744 (2020). The same is true of matters pertaining to national security, which "is the prerogative of the Congress and President." *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see also Ullmann v. United States*, 350 U.S. 422, 436 (1956). Courts are particularly reluctant to declare a statute unconstitutional where it "implicates sensitive and weighty interests of national security and foreign affairs." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010).

In enacting the CTA, Congress made specific findings that, among other things, "malign actors seek to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate illicit activity, … harming the national security interests of the United States and allies of the United States." NDAA § 6402(3). And Congress concluded that collecting beneficial ownership information "is needed to … protect vital Unite[d] States

national security interests"; "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity"; and "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards," *id.* § 6402(5), 134 Stat. at 4604, specifically those set by the Financial Action Task Force, H.R. Rep. No. 116-227, at 11. The Executive Branch agrees with that assessment. *See, e.g.*, 87 Fed. Reg. at 59,498.

Plaintiffs' argument to the contrary primarily relies on *Bond v. United States*, 572 U.S. 844 (2014). *See* PI Br., PageID.86-88. Bond sprayed a chemical compound on the victim's car and house door in an attempt to cause "an uncomfortable rash," and she was charged with violating a federal law that implemented the international Convention on Chemical Weapons and criminalized the use or possession of any chemical weapon. *Bond*, 572 U.S. at 851-53. The Court held that this statute did not reach Bond's "purely local" offense. *Id.* at 863. *Bond* is far afield. First, *Bond* involved statutory interpretation, and did not involve the constitutional question of Congress's broad foreign affairs and national security powers. *See id.* at 856. Second, Bond involved a "purely local crime," described as an "unremarkable local offense." *See id.* at 848. Here, as Congress explained in enacting the AMLA, the CTA is necessary to prevent interstate and international money laundering, terrorism financing, and tax evasion—economic crimes with significant national security implications.

### iii. The CTA Is Authorized by Congress's Power to Levy and Collect Taxes.

The CTA's reporting requirement is also a necessary and proper exercise of the government's authority to levy and collect taxes. U.S. Const. art. I, § 8, cl. 1. As part of that authority, Congress may enact legislation designed to facilitate tax collection. *See Helvering v. Mitchell*, 303 U.S. 391, 399 (1938). Indeed, Congress has given the IRS "broad power to require the submission of tax-related information that it believes helpful in assessing and collecting taxes."

*CIC Servs., LLC v. IRS*, 593 U.S. 209, 212 (2021).  Here, for example, Congress determined that the lack of ownership information allows criminals to obscure their income and assets and thus "facilitate[s] … serious tax fraud."  NDAA § 6402(3).  Congress found that the reporting requirements would be "highly useful" in enabling investigators to detect tax fraud, 31 U.S.C. § 5336(a)(11)(xxiv), and in improving "tax administration" generally, *id.* § 5336(c)(5)(B).  The CTA's reporting requirements are therefore authorized by Congress's authority to take all steps necessary and proper to preserve the government's ability to assess and collect taxes.  *See Jinks v. Richland County*, 538 U.S. 456, 462 (2003) (no requirement that statute be "absolutely necessary" to regulatory regime to uphold under Necessary and Proper Clause); *Comstock*, 560 U.S. at 133-34 (sufficient to uphold under Necessary and Proper Clause if statute is "convenient, or useful").

## B.  The CTA Does Not Violate the Fourth Amendment

Plaintiffs' Fourth Amendment claim fails at the outset because Plaintiffs have not established a reasonable expectation of privacy in the relevant information, which is already publicly available, disclosed to the government or third parties, and/or is not the type of information for which there is a societal expectation of privacy.  Even if the Court discerned privacy interests in that information, Plaintiffs' claim still fails because the CTA is reasonable under the Fourth Amendment—just like other statutory reporting requirements upheld by the Supreme Court.

### i.  Plaintiffs Lack a Reasonable Expectation of Privacy as to Information Subject to the CTA.

The strictures of "the Fourth Amendment do[] not apply" where a plaintiff "has no reasonable expectation of privacy in the information sought."  *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 577 (6th Cir. 2002).  As the Supreme Court explained in *Smith v. Maryland*, this inquiry "embraces two discrete questions."  442 U.S. 735, 740 (1979).  "The first is whether the individual … has exhibited an actual (subjective) expectation of privacy," and the

second "is whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable." *Id.* (quotations omitted). Plaintiffs have not sufficiently demonstrated either one.

"Individuals generally lose a reasonable expectation of privacy in their information once they reveal it to third parties." *Guest v. Leis*, 255 F.3d 325, 335 (6th Cir. 2001); *United States v. Miller*, 425 U.S. 435, 443 (1976) (similar). As a result, the individual Plaintiffs have no reasonable expectation of privacy in information regarding their names, dates of birth, addresses, and ownership interests, to the extent it appears in the records of reporting companies. *See United States v. Phibbs*, 999 F.2d 1053, 1078 (6th Cir. 1993) (no reasonable expectation of privacy in information "readily accessible to employees during the normal course of business"). The individual Plaintiffs do not allege, let alone show, that their companies do not already have such information. Plaintiffs' citation to *Carpenter v. United States*, 585 U.S. 296 (2018) does not further their claim, as the Supreme Court's "narrow" decision there "d[id] not disturb" existing third-party disclosure doctrine, but rather declined to extend it to the "novel circumstances" of "cell phone location records," given those records' "unique" capacity to track a person's physical movements over time. *Id.* at 309, 316; *see United States v. Trader*, 981 F.3d 961, 968 (11th Cir. 2020) (stating that "*Carpenter*'s 'narrow' exception applies only to some cell-site location information, not to ordinary business records" (citation omitted)).

Similarly, the individual Plaintiffs cannot claim a reasonable expectation of privacy as against the government in information that they already disclose pursuant to other regulatory requirements, such as by filing tax returns or passport forms—or in information the government itself provided to them, such as passport numbers.[5] *See Couch v. United States*, 409 U.S. 322, 335

---

[5] *See, e.g.*, IRS, Form 1040, https://perma.cc/YR59-EBXP; Dep't of State, Application for a U.S. Passport, https://perma.cc/8BFM-XJKS; *Corporations*, Licensing and Regulatory Affairs, State

(1973) ("[T]here can be little expectation of privacy where records are handed to an accountant, knowing that mandatory disclosure of much of the information therein is required in an income tax return.").  Indeed, searching the names "Derek Dickow" and "Timothy A. Eisenbraun" on Michigan's Corporations Online Filing System produces public records showing their names, addresses, and association with Plaintiff entities Power Connections Co., LLC, Semper Real Estate Advisors, LLC, and Steward Media Group, LLC.  *See* Department of Licensing and Regulatory Affairs, Corporations Online Filing System, https://cofs.lara.state.mi.us/SearchApi/Search/Search; *Kelly v. City of Sterling Heights*, 1991 WL 207548, at *2 (6th Cir. Oct. 16, 1991) ("In Michigan the name and address of the record owner of a vehicle is available to the public for legitimate purposes.  The plaintiffs, therefore, had no expectation of privacy with regard to this information ….").

Finally, the individual Plaintiffs do not provide any support for the existence of a reasonable expectation of privacy in their "ownership networks," PI Br., PageID.75, and "[a]s the Sixth Circuit has consistently recognized, there is no privacy interest in the financial affairs of an individual."  *State Farm Mut. Ins. v. Policherla*, 2009 WL 2170183, at *3 (E.D. Mich. July 20, 2009); *see also Miller*, 425 U.S. at 442 (no expectation of privacy in checks because they "are not confidential communications" but "instruments to be used in commercial transactions").  The individual Plaintiffs therefore have not shown subjective or objective expectations of privacy in this information.

The reporting-entity Plaintiffs moreover do not persuasively establish a reasonable expectation of privacy in the identities of their beneficial owners.  In a case Plaintiffs rely on,

---

of Michigan, https://www.michigan.gov/lara/bureau-list/cscl/corps/corporations/intro/ corporations (noting that disclosure of the "[n]ame and business or residence address of the incorporators" is required "[i]n order to form a corporation"); 87 Fed. Reg. at 59,519 ("[D]isclosures of this type already occur regularly in a variety of circumstances.").

PI Br., PageID.72, the Supreme Court explained the weaker privacy interests of corporations:

> [C]orporations can claim no equality with individuals in the enjoyment of a right to privacy. They are endowed with public attributes. They have a collective impact upon society, from which they derive the privilege of acting as artificial entities. The Federal Government allows them the privilege of engaging in interstate commerce. Favors from government often carry with them an enhanced measure of regulation.

*United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (citation omitted). That Michigan may not require companies to disclose "which individuals have 'substantial control'" over them, PI Br., PageID.74, does not affirmatively establish their privacy interest in that information, and Plaintiffs provide no support for the proposition that it is "the kind of commercially sensitive information … such as trade secrets," for which society recognizes an expectation of privacy. *MA LEG Partners 1 v. City of Dallas*, 442 F. Supp. 3d 958, 967 (N.D. Tex. 2020) (quotation omitted).

In Plaintiffs' primary case, where the Supreme Court invalidated a city ordinance permitting Los Angeles police to rummage through hotel registry records, the Supreme Court did not discuss the hotels' privacy interests in that information. *See Patel v. City of Los Angeles*, 576 U.S. 409 (2015). Plaintiffs instead quote from the underlying and non-controlling Ninth Circuit decision, PI Br., PageID.73-74, where that Circuit concluded that the hotels had a legitimate privacy interest against "physical intrusion upon [their] papers," given their "possessory and … ownership interest in" those papers. *Patel v. City of Los Angeles*, 738 F.3d 1058, 1061 (9th Cir. 2013). The CTA permits no such governmental inspection of a business's files, and only requires reporting of specified information. The mere fact that this information may also appear in a business record does not transform provision of the information into inspection of the record.

Lacking reasonable expectations of privacy in the reported information, Plaintiffs' motion for preliminary injunction should be denied.

### ii. The CTA's Reporting Requirements Are Reasonable under the Fourth Amendment.

Even if Plaintiffs had shown a reasonable expectation of privacy, the CTA is still valid under the Fourth Amendment. "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995); *see also Maryland v. King*, 569 U.S. 435, 446-47 (2013) ("The Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances …." (quotation and alteration omitted)). And the Supreme Court has spoken directly to the reasonableness of congressionally mandated corporate reporting requirements in *Shultz*. That case involved BSA provisions establishing "general recordkeeping requirements for banks" and requiring "certain reports of domestic transactions [to the government] where such reports have a high degree of usefulness in criminal, tax, or regulatory investigations." *Shultz*, 416 U.S. at 30-31, 37. As here, the BSA was challenged under the Fourth Amendment. *Id.* at 64-65. The Supreme Court rejected that challenge on reasonableness grounds, concluding that, because "the information is sufficiently described and limited in nature, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce," and moreover, a bank was "not a mere stranger or bystander with respect to the transactions which it is required to … report," the BSA "d[id] not impose unreasonable reporting requirements" under the Fourth Amendment. *Id.* at 66-67.

*Shultz* confirms that the CTA's reporting requirements are reasonable. A company that files formation documents with a state "is not a mere stranger" to its beneficial owners and applicants, and neither are the owners and applicants strangers to the company. *Shultz*, 416 U.S. at 66. Instead, a corporation owes its existence to those individuals, and is itself the vehicle through which ownership or control is exercised. Moreover, the CTA "sufficiently describe[s]" the

"limited" information subject to disclosure, *id.*; *see* 31 U.S.C. § 5336(b)(2), which Congress and the Executive Branch plausibly determined was crucial to further the compelling law enforcement, national security, and foreign policy interests of the United States, *see* 31 U.S.C. § 5336(b)(1)(F)(iv)(I); 87 Fed. Reg. at 59,498-500. In an attempt to distinguish *Shultz*, Plaintiffs wrongly argue that the BSA only "required that banks keep records" of certain transactions, not "provide them directly" to the government. PI Br., PageID.78-79. That is incorrect: *Shultz* addressed both "the recordkeeping requirements" of the BSA, *see* 416 U.S. at 52, as well as "the reporting requirements of the regulations authorized in … the Act," *id.* at 57, finding the BSA constitutionally sufficient on both counts. *See id.* at 39 & n.15 (BSA-authorized regulation required reporting of transactions in excess of $10,000).

Plaintiffs' insistence that there exists an ironclad requirement for a warrant or "opportunity to obtain precompliance review before a neutral decisionmaker," PI Br., PageID.77, is out of step with the Supreme Court's admonition that "'[t]he touchstone of the Fourth Amendment is reasonableness,' not 'bright-line rules.'" *United States v. Jones*, 953 F.3d 433, 436 (6th Cir. 2020) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)); *see also Brock v. Emerson Elec. Co.*, 834 F.2d 994, 996 n.2 (11th Cir. 1987) (observing that in cases like *Shultz*, "a uniform statutory or regulatory reporting requirement satisfies the Fourth Amendment concern regarding the potential for arbitrary invasions of privacy"); *Donovan v. Master Printers Ass'n*, 532 F. Supp. 1140, 1153 (N.D. Ill. 1981) ("The [F]ourth [A]mendment simply requires that the reporting scheme imposed by the statute bear a reasonable relationship to a permissible subject of governmental inquiry and not place an undue burden on the defendant."). The mere existence of *Shultz* disproves any such rule in the context of congressionally mandated corporate reporting requirements, whether construed as administrative searches or otherwise, as do cases upholding other familiar reporting requirements like the tax return system. *See Flint v. Stone Tracy Co.*, 220 U.S. 107, 174-77 (1911)

(corporate tax return requirements); *Donovan*, 532 F. Supp. at 1152-53 (Labor Management Reporting and Disclosure Act requirements).

Plaintiffs' reliance on *Patel* and cases governing *Terry* stops does not show otherwise. The critical difference between this matter (along with *Shultz*) and Plaintiffs' cases is that the former involves uniform and defined statutory reporting requirements, while the latter involves discretionary and unlimited physical searches. As discussed, *Patel* concerned on-demand "inspections" of hotel guest records by city police. 576 U.S. at 412-14. The Supreme Court concluded that precompliance review was necessary because of a "risk that searches … will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests," such as a hotel being "searched 10 times a day, every day, for three months." *Id.* at 421; *see also id.* at 423 ("[T]he availability of precompliance review … reduces the risk that officers will use these administrative searches as a pretext to harass business owners."). In the *Terry* stop cases, the Supreme Court similarly determined that "reasonable suspicion" was necessary to prevent persons from being "subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Brown v. Texas*, 443 U.S. 47, 51 (1979). Because the CTA requires reporting of specific information under specific statutory criteria, rather than providing field officers with leave to conduct limitless, discretionary searches of Plaintiffs' persons or files, it presents no such risk of pretextual or arbitrary harassment. *See Brock*, 834 F.2d at 996 n.2 (differentiating cases "involv[ing] discretionary and potentially arbitrary requests for document inspection," where a subpoena may be required, with "cases in which businesses or individuals are required to report particular information to the government on a regular basis").

Alternatively, even as to cases that establish a warrant requirement in some contexts, the CTA falls within the "special needs" exception to such a requirement. *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 619 (1989) ("When faced with … special needs, we have not hesitated to

balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context."). The CTA addresses a need "beyond the normal need for law enforcement," *id.*—that is, the advancement of U.S. national security and foreign policy interests, *see Klayman v. Obama*, 805 F.3d 1148, 1149 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc). The compelling need to address threats to "U.S. national security and foreign policy interests," 87 Fed. Reg. at 59,500, outweighs any privacy interest in the limited disclosures required by the CTA. *Cf. United States v. Gordon*, 2016 WL 11668976, at *3 (D. Mass. Aug. 30, 2016) ("[R]outine security searches at airport checkpoints pass constitutional muster because the compelling public interest in curbing air piracy generally outweighs their limited intrusiveness."). Further, requiring FinCEN to obtain a warrant prior to gathering beneficial ownership information would be "impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 876 (1987). The Executive Branch must often act quickly to identify beneficial owners if it wishes to prevent asset flight initiated by actors who can transfer funds instantaneously. 87 Fed. Reg. at 59,504-05. And in some instances, records of beneficial ownership information do not exist. *Id.* at 59,504.

In sum, the CTA's reporting requirements are reasonable under the Fourth Amendment. Plaintiffs thus have not demonstrated entitlement to an injunction even if the Court were to conclude that they have a reasonable expectation of privacy in the reported information.

### C. The CTA Does Not Violate the Fifth Amendment

"Unconstitutionally vague statutes are those that are not subject to reasonable interpretation." *United States v. Cunningham*, 2021 WL 4864301, at *3 (E.D. Mich. Oct. 19, 2021). "[T]he degree of vagueness that the Constitution tolerates … depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). First, "economic regulation is subject to a less strict vagueness test, because its subject

matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Id.* Second, where the law does not "restrict[] constitutionally protected actions, like freedom of speech or association … a less onerous test applies." *United States v. Anvari-Hamedani*, 378 F. Supp. 2d 821, 830 (N.D. Ohio 2005); *see also Hoffman Estates*, 455 U.S. at 499 (similar). Third, a "scienter requirement … mitigates the statutes' alleged vagueness." *United States v. Charczenko*, 1995 WL 7961, at *2 (6th Cir. Jan. 9, 1995); *see also United States v. Hescorp*, 801 F.2d 70, 77 (2d Cir. 1986) ("[A] requirement of willfulness makes a vagueness challenge especially difficult to sustain."). The CTA is subject to substantially reduced vagueness scrutiny under these precedents: it is an economic regulation aimed at incorporation; Plaintiffs do not allege that it restricts protected First Amendment activity; and its penalty provisions include scienter requirements, *see* 31 U.S.C. § 5336(h)(1) (willfulness); *id.* § 5336(h)(6) ("In this subsection, the term 'willfully' means the voluntary, intentional violation of a known legal duty").

The CTA easily clears this bar. In their motion, Plaintiffs challenge as vague the CTA's definition of "beneficial owner," and specifically the extent to which it includes those who, through any "understanding, relationship, or otherwise," exercise "substantial control over the entity." 31 U.S.C. § 5336(a)(3)(A)(i). The plain text of the "beneficial owner" definition allows ordinary people to understand what the law requires: reporting companies must report individuals who exert significant control over the company. *See id.*; *see also* 31 C.F.R. § 1010.380(d)(1) (additional guidance). Courts have repeatedly concluded that similar statutory terms pose no concern. *See United States v. Flores*, 63 F.3d 1342, 1373 (5th Cir. 1995) (rejecting argument "that the term 'substantial' is vague because it is subjective and has different meanings" and concluding that a "'substantiality' requirement is frequently encountered and readily understood in a number of contexts"); *Wacko's Too, Inc. v. City of Jacksonville*, 522 F. Supp. 3d 1132, 1162-63 (M.D. Fla.

2021) (holding term "owner" not vague, as the statute "indicate[d] an intent to hold accountable those who control, direct, or otherwise exercise dominion in running [certain businesses]"); *United States v. Re*, 336 F.2d 306, 316 (2d Cir. 1964) (rejecting argument that "control" was "unconstitutionally vague and indefinite" and stating that "[t]he meaning of 'control' under the [Securities Act of 1933] is no different than it is in normal everyday usage").

Plaintiffs cannot gainsay this reality by plying the Court with fanciful hypotheticals wherein, for example, "five adult siblings … form an LLC, where each owns less than 25%." PI Br., PageID.90. "Close cases can be imagined under virtually any statute," and a statute is not vague merely because "it may be difficult in some cases to determine whether [its] clear requirements have been met." *United States v. Williams*, 553 U.S. 285, 306 (2008); *see also Hill v. Colorado*, 530 U.S. 703, 733 (2000) (mere fact that "imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question" did not render statute vague).

Moreover, the Supreme Court and Sixth Circuit have stated that "it is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2001) (quoting *United States v. Powell*, 423 U.S. 87, 92 (1975)). Plaintiffs therefore "bear[] the burden of establishing that the statute is vague as applied to [their] particular case, not merely that the statute could be construed as vague in some hypothetical situation." *Id.*; *see also United States v. Kernell*, 667 F.3d 746, 750 (6th Cir. 2012) (similar).[6] Plaintiffs do not explain why the definition of "beneficial owner" is vague as applied to the actual facts of this case, and the individual plaintiffs appear to have a clear understanding that they are obliged to comply. *See* Compl. ¶ 30, PageID.12 ("Mr. Dickow's sensitive personal information will be disclosed to

---

[6] To the extent a plurality of the Supreme Court permitted a facial vagueness challenge to "a criminal law that contains no *mens rea* requirement," *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999), such an exception would not apply to the CTA, which includes a willfulness requirement.

FinCEN unless the Defendants are enjoined from enforcing the CTA. Mr. Dickow objects to being forced to comply with the CTA …. Mr. Dickow would comply with the CTA only because he would be forced to do so ….); *id.* ¶ 32, PageID.14 (similar for Mr. Eisenbraun); *see also Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.")

Plaintiffs also challenge the CTA penalty provision's application to "any person," 31 U.S.C. § 5336(h)(1), asserting that it is unclear whether it is the beneficial owner or entity who incurs liability when the beneficial owner "refuses to supply the required personal information." PI Br., PageID.91. The penalty provision is clear: it applies to any "person," legal or natural, who "willfully" fails to report or provides false information in a report. 31 U.S.C. § 5336(h)(1); *see also id.* at § 5336(h)(6) ("In this subsection, the term 'willfully' means the voluntary, intentional violation of a known legal duty."); 31 C.F.R. § 1010.380(g)(1) ("The term 'person' includes any individual, reporting company, or other entity."). While again the Court has no need to consider hypotheticals untethered to this case, Plaintiffs' hypothetical presents no difficulty. To the extent beneficial owners or applicants "willfully" fail to provide the required information to reporting entities, they are subject to the penalty provision. *See* 31 C.F.R. § 1010.380(g)(3) (explaining that a "person provides or attempts to provide beneficial ownership information to FinCEN if such person does so directly or indirectly, including by providing such information to another person for purposes of a report or application under this section"); *Hoffman Estates*, 455 U.S. at 494 n.5 ("In evaluating a facial challenge … a federal court must, of course, consider any limiting construction that a[n] … enforcement agency has proffered."). Similarly, if an entity's failure to report is not "voluntary" and "intentional" on its part, it has not "willfully" violated the statute. 31 U.S.C. § 5336(h)(6). Plaintiffs therefore have not established a likelihood of success on the merits of their Fifth Amendment claim.

## II.  THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH AGAINST AN INJUNCTION

The Court may appropriately deny the motion for preliminary injunction where, as here, Plaintiffs do not establish any likelihood of success on the merits of their constitutional claims. *E.g.*, *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) ("[A] court must not issue a preliminary injunction where the movant presents no likelihood of merits success." (quotation omitted)); *Gonzales v. Nat'l Bd. of Medical Examiners*, 225 F.3d 620, 632 (6th Cir. 2000) ("Because we conclude that Plaintiff has no likelihood of success on the merits, we need not consider whether he would otherwise be entitled to a preliminary injunction.").

Even if the Court considers the other factors, they weigh against granting the relief Plaintiffs seek.  Plaintiffs have moved for a preliminary injunction and requested that the Court expedite its consideration of that motion on the basis that one set of Plaintiffs—Semper Real Estate Advisors and its member, Timothy A. Eisenbraun—will suffer irreparable harm if the Court does not enjoin Defendants from enforcing the CTA prior to these Plaintiffs' April 28, 2024 reporting deadline.  ECF No. 10, PageID.53.  These Plaintiffs had 90 days from formation to comply with the CTA's reporting requirements, and they filed their preliminary injunction motion approximately 30 days prior to their reporting deadline.[7]  Even if these Plaintiffs can nonetheless establish that they will suffer irreparable harm absent the expedited issuance of a preliminary injunction, the other Plaintiffs are not similarly situated.  *See id.*  Accordingly, the remaining Plaintiffs have failed to demonstrate that they or their members would suffer irreparable harm absent the issuance of an immediate preliminary injunction.

---

[7] Plaintiffs appear to blame FinCEN for the timing of their challenge, claiming that they were forced to file when they did because "FinCEN asserts that [they] do not come within the scope of th[e] judgment" in *NSBU*.  PI Br., PageID.70.  The reason the injunction in *NSBU* is limited is not because "FinCEN asserts" that it is so, but rather because the injunction is limited on its own terms to the plaintiffs there.  *See* Final Judgment, *NSBU*, No. 5:22-cv-1448 (N.D. Ala. Mar. 1, 2024), ECF No. 52.

Finally, the third and fourth factors—the balance of equities and the public interest—militate against an injunction: "the public-interest factor 'merges' with the substantial-harm factor when the government is the defendant, and neither of these factors can be satisfied when the challenged provisions are constitutional." *Daunt v. Benson*, 956 F.3d 396, 422 (6th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)) (alteration omitted). "[T]he public interest necessarily weighs against enjoining a duly enacted statute." *Priorities USA v. Nessel*, 860 F. App'x 419, 423 (6th Cir. 2021); *see also Mich. Chamber of Com. v. Land*, 725 F. Supp. 2d 665, 683 (W.D. Mich. 2010) ("The public has an interest in having the laws enacted by its representatives enforced."). This is especially true here, where the CTA "protect[s] vital United States national security interests," and "enable[s] critical … efforts to counter money laundering, the financing of terrorism, and other illicit activity." NDAA § 6402(5); *see, e.g.*, *Winter*, 555 U.S. at 26 (public interest weighed against injunction where challenged action is "essential to national security"). Consideration of these factors only confirms that an injunction is unwarranted.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated: April 15, 2024     Respectfully submitted,

             BRIAN M. BOYNTON
             Principal Deputy Assistant Attorney General

             DIANE KELLEHER
             Assistant Branch Director

             */s/ Michael J. Gaffney*
             MICHAEL J. GAFFNEY
             CHRISTIAN S. DANIEL
             Trial Attorneys
             United States Department of Justice
             Civil Division, Federal Programs Branch
             1100 L St. NW

Washington, DC 20005
Tel: (202) 514-2356
Email: michael.j.gaffney@usdoj.gov

*Counsel for Defendants*