**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

SMALL BUSINESS ASSOCIATION OF     )
MICHIGAN, *et al.*,                    )
                                 )
                Plaintiffs,       )
                                 )
             v.             )     Case No. 1:24-cv-314
                                 )
JANET YELLEN, in her official capacity as the )    Hon. Robert J. Jonker
Secretary of the United States Department of   )
the Treasury, *et al.*,               )
                                 )
                Defendants.    )

_____


**DEFENDANTS' BRIEF IN SUPPORT OF CROSS-MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DIANE KELLEHER            United States Department of Justice
Assistant Branch Director       Civil Division, Federal Programs Branch
                              1100 L Street, N.W.
CHRISTIAN S. DANIEL       Washington, D.C. 20005
MICHAEL J. GAFFNEY       Tel: (202) 514-5838
Trial Attorneys               Email: christian.s.daniel@usdoj.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS......................................................................................................2

I.     CONGRESS'S ENACTMENT OF THE ANTI-MONEY LAUNDERING ACT
AND THE CTA.............................................................................................................2

II.    PROCEDURAL HISTORY.............................................................................................6

ARGUMENT.........................................................................................................................7

I.     THE CTA IS AUTHORIZED BY CONGRESS'S POWERS. ........................................7

     A.    The CTA Is Authorized by Congress's Power to Regulate Interstate and
          Foreign Commerce.............................................................................................7

     B.    The CTA Is Authorized by Congress's Power to Regulate Foreign Affairs
          and Ensure National Security. ..........................................................................16

     C.    The CTA Is Authorized by Congress's Power to Lay and Collect Taxes............16

II.    THE CTA DOES NOT VIOLATE THE FOURTH AMENDMENT.............................18

     A.    The CTA Is Consistent with the Fourth Amendment Standards Applicable
          to Such Reporting Requirements. ......................................................................18

     B.    The CTA Is Reasonable Under the "Special Needs" Exception. .........................29

III.   THE CTA DOES NOT VIOLATE THE FIFTH AMENDMENT. ................................31

CONCLUSION....................................................................................................................34

# INTRODUCTION

For decades, Congress has legislated to curb money laundering, terrorist financing, and other harmful economic activities. As illicit actors find new ways to circumvent those laws, Congress has responded to ensure that the government possesses information to counteract such evolving threats. Most recently, these threats come from the exploitation of legal entities such as corporations to facilitate illicit financial activities. Criminals, both domestic and international, can easily create these entities under differing state laws and may generally do so without disclosing their involvement. As a result, the United States has become a popular jurisdiction for criminals to create legal entities that facilitate and further money laundering, human smuggling, corruption, drug trafficking, and terrorist financing.

To address these problems, Congress passed the Anti-Money Laundering Act of 2020, which includes the Corporate Transparency Act ("CTA"). This law requires certain companies to report information concerning their beneficial owners and those individuals filing certain entity-creation or registration forms to the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury. Congress assessed that this information—including a beneficial owner's name, address, date of birth, and a unique identifier such as a driver's license number—will prove highly useful to law enforcement and the intelligence community's efforts to counter the threat posed by criminals, terrorists, and others undermining U.S. interests.

Plaintiffs—Michigan-based business associations, their members, and business owners— claim that these limited reporting requirements exceed Congress's enumerated powers and violate the Fourth and Fifth Amendments. Each challenge fails. The CTA (1) falls well within Congress's power—amplified by the Necessary and Proper Clause—to regulate commerce, ensure national security, and lay and collect taxes; (2) comports with the Fourth Amendment; and (3) is sufficiently clear as to defeat a void-for-vagueness claim. Defendants are entitled to summary judgment.

**STATEMENT OF FACTS**

The material facts are not in dispute and this case can be decided as a matter of law. *See* Pls.' Br., ECF No. 27, PageID.667.[1]

## I. CONGRESS'S ENACTMENT OF THE ANTI-MONEY LAUNDERING ACT AND THE CTA

Congress has long worked to address financial crime through legislation. *See, e.g.*, Currency and Foreign Transactions Reporting Act of 1970 ("CFTRA"), Pub. L. No. 91-508 § 121, 84 Stat. 1114 (1970).[2] Despite these efforts, there remained a significant gap in the government's ability to detect and prosecute financial crime. Under state law, "corporations, limited liability companies [("LLCs")], [and] other similar entities" are generally not required to disclose "information about the[ir] beneficial owners." National Defense Authorization Act ("NDAA"), Pub. L. No. 116-283, § 6402(2), 134 Stat. 3388, 4604 (2021).[3] "A person forming a corporation or [LLC] within the United States" thus "typically provides less information at the time of incorporation than is needed to obtain a bank account or driver's license …." H.R. Rep. No. 116-227, at 2 (2019). That enables "malign actors" to "conceal their ownership of corporations" and then use those anonymous corporations to engage in "money laundering," "the financing of terrorism," and "serious tax fraud." NDAA § 6402(3).

Criminals routinely exploit this information gap. Federal prosecutors report that "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies." Beneficial Ownership Information Reporting

---

[1] That does not mean that Defendants agree with incorrect and unsupported implications Plaintiffs seek to draw from the facts, such as Plaintiffs' position that "[t]he CTA was designed to circumvent traditional Fourth Amendment protections." Pls.' Br., PageID.667.

[2] Parts of the Currency and Foreign Transactions Reporting Act of 1970, its amendments, and other statutes, are referred to as the Bank Secrecy Act, codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-60, and 31 U.S.C. §§ 5311-14 and §§ 5316-36.

[3] The AMLA and CTA were enacted as part of the NDAA.

Requirements, 87 Fed. Reg. 59,498, 59,503 (Sept. 30, 2022) (quotations omitted).[4] Likewise, drug traffickers "commonly use shell and front companies to commingle illicit drug proceeds with legitimate revenue of front companies, thereby enabling the [traffickers] to launder their drug proceeds." *Id.*

In addition to facilitating domestic crime, the absence of company-ownership information threatens U.S. national security and foreign policy interests. For instance, "Russian elites, state-owned enterprises, and organized crime, as well as the Government of the Russian Federation have attempted to use U.S. and non-U.S. shell companies to evade sanctions." *Id.* at 59,498. The Government of Iran has similarly deployed shell companies "to obfuscate the source of funds and hide its involvement in efforts to generate revenue." *Id.* at 59,502.

For similar reasons, criminals can use the government's lack of information about the ownership of corporations to obscure their income and assets and thus perpetrate "serious tax fraud." NDAA § 6402(3). Indeed, a "Treasury study based on a statistically significant sample of adjudicated IRS cases from 2016-2019 found legal entities were used in a substantial proportion of the reviewed cases to perpetrate tax evasion and fraud." 87 Fed. Reg. at 59,503 (quotations omitted). Because it did not collect beneficial ownership information, the United States had fallen out of "compliance with international anti-money laundering and countering the financing of terrorism standards." NDAA § 6402(5)(E).

To address this information gap, Congress enacted ownership reporting requirements. The Anti-Money Laundering Act of 2020 ("AMLA") adopts various provisions designed to "modernize" federal "anti-money laundering" laws and those "countering the financing of terrorism." NDAA § 6002(2). Among those provisions is the CTA, which "establish[es] uniform

_____

[4] "Shell companies" are entities "that have no physical presence beyond a mailing address, generate little to no independent economic value, and generally are created without disclosing their beneficial owners." 87 Fed. Reg. at 59,501 (footnote omitted).

beneficial ownership information reporting requirements." *Id*. § 6002(5).  In passing the AMLA and CTA, Congress explained that "Federal legislation providing for the collection of beneficial ownership information for corporations, [LLCs], or other similar entities formed under the laws of the States is needed," among other purposes, to "protect vital Unite[d] States national security interests," "protect interstate and foreign commerce," and "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity." *Id.* § 6402(5)(B)-(D).

Under the CTA, each "reporting company" must disclose to FinCEN information about beneficial owners and applicants. 31 U.S.C. § 5336(b).  A "reporting company" is "a corporation, [LLC], or other similar entity that is … (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.* § 5336(a)(11)(A).

Congress exempted from the reporting requirements numerous categories of legal entities, including banks, public accounting firms, and other businesses already subject to other reporting or recordkeeping requirements. *See* 31 U.S.C. § 5336(a)(11)(B).  It excludes many domestically owned entities no longer engaged in business. *Id*. § 5336(a)(11)(B)(xxiii).  It also excludes many trusts, political organizations, and non-profits. *See id*. § 5336(a)(11)(B)(xix).  And it allows the government to exempt any other "entity or class of entities" for which reporting would not "serve the public interest" and "would not be highly useful" in "efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, … or other crimes." *Id*. § 5336(a)(11)(B)(xxiv).

Congress has additionally defined "beneficial owner" as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise …

(i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity."  31 U.S.C. § 5336(a)(3)(A); *but see id.* § 5336(a)(3)(B) (exemptions).  An "applicant" is the individual who files or directs the filing of documents to create the corporate entity or, if foreign, register it to do business in the United States.  *Id.* § 5336(a)(2); 31 C.F.R. § 1010.380(e).  To comply with its statutory obligations, a reporting company must report the legal name, date of birth, residential or business address, and "unique identifying number from an acceptable identification document" of each beneficial owner and applicant.  31 U.S.C. § 5336(b)(2)(A); 31 C.F.R. § 1010.380(b)(1)(ii)(E) (requiring submission of image of identifying document from which identifying number was obtained).  If formed prior to January 1, 2024, a reporting company is not required to report applicant information, but it must provide beneficial ownership information by January 1, 2025.  31 U.S.C. § 5336(b)(1)(B); 31 C.F.R. § 1010.380(a)(1)(iii), (b)(2)(iv).  Reporting companies formed or registered during 2024 must provide beneficial ownership and applicant information within 90 days of notice of the entity's creation or registration.  31 U.S.C. § 5336(b)(1)(C); 31 C.F.R. § 1010.380(a)(1)(i).  For reporting companies created or registered after 2024, compliance will be required within 30 days of notice of formation.  31 C.F.R. § 1010.380(a)(1)(i)(B).  Reporting companies must also disclose changes to beneficial ownership information within 30 days.  31 U.S.C. § 5336(b)(1)(D); 31 C.F.R. § 1010.380(a)(2).  Willful reporting violations may lead to civil or criminal penalties.  31 U.S.C. § 5336(h); 87 Fed. Reg. at 59,545-47.

Congress ensured that FinCEN would appropriately maintain the reported information.  31 U.S.C. § 5336(c)(3), (8).  Such information is generally deemed "confidential and may not be disclosed" except as authorized by the CTA.  *Id.* § 5336(c)(2)(A).  For instance, FinCEN may disclose beneficial ownership information after receiving a request "from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of

such activity," or to "a State, local, or Tribal law enforcement agency, if a court of competent jurisdiction … has authorized the law enforcement agency to seek the information in a criminal or civil investigation." *Id.* § 5336(c)(2)(B)(i). In certain circumstances, FinCEN may also disclose beneficial ownership information to "a Federal agency on behalf of a law enforcement agency, prosecutor, or judge of another country," or to "a Federal functional regulator or other appropriate regulatory agency." *Id.* § 5336(c)(2)(B)(ii), (B)(iv), (C). FinCEN may nonetheless reject requests, including for "good cause." *Id.* § 5336(c)(6).

In accordance with the CTA, 31 U.S.C. § 5336(b)(1), FinCEN issued a final rule concerning the reporting of beneficial ownership information in September 2022. 87 Fed. Reg. 59,498. In relevant part, the final rule further defines the terms "beneficial owner," "substantial control," "ownership interests," "company applicant," "domestic reporting company," and "foreign reporting company." *Id.* at 59,525-33, 59,536-39.

## II.    PROCEDURAL HISTORY

On March 26, 2024, Plaintiffs filed this action. Plaintiffs self-identify as two business associations, three companies who are members of one or both of those associations, and two of the companies' individual owners. Compl., ECF No. 1, PageID.8-14. They allege that the three companies are subject to the CTA's reporting requirements and will have to report information regarding the Plaintiff individuals. *See id.* Plaintiffs assert three claims: (1) the CTA exceeds Congress's enumerated powers, *id.* ¶¶ 83-84, PageID.24; (2) the CTA's reporting requirements violate the Fourth Amendment, *id.* ¶ 89, PageID.25; and (3) "the CTA is unconstitutionally vague, in violation of the Due Process Clause of the Fifth Amendment," *id.* ¶ 113, PageID.29. Also on March 26, Plaintiffs filed a Motion for Preliminary Injunction. *See* ECF No. 10. The Court denied Plaintiffs' motion in full for the reasons stated on the record. *See* ECF No. 24.

**ARGUMENT**

Summary judgment is appropriate when there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The CTA falls well within Congress's enumerated powers, and is fully consistent with the Fourth and Fifth Amendments. The Court should therefore grant summary judgment to Defendants in full.

## I. THE CTA IS AUTHORIZED BY CONGRESS'S POWERS.

Plaintiffs' enumerated-powers claim fails on three independent grounds. First, the CTA fills a critical gap in a comprehensive scheme to prevent harmful economic activity and it directly regulates commercial enterprises, and is thus authorized by both the Commerce and Necessary and Proper Clauses. Second, the CTA is a proper exercise of Congress's authority to regulate foreign affairs and ensure the nation's security. Third, the CTA is necessary to prevent bad actors from frustrating the government's ability to lay and collect taxes.

### A. The CTA Is Authorized by Congress's Power to Regulate Interstate and Foreign Commerce.

The Constitution grants Congress the power to "make all Laws which shall be necessary and proper" to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8. "Congress has broad authority under the [Commerce] Clause." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) ("*NFIB*"). In addition to regulating the "channels" and "instrumentalities of interstate commerce," Congress may "regulate activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005); *see also Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 541 (6th Cir. 2011) (describing the "three broad spheres" of Commerce Clause authority), *abrogated on other grounds by NFIB*, 567 U.S. 519 (op. of Roberts, C.J.).

Congress may take all steps necessary and proper to regulate such activities. *United States v. Comstock*, 560 U.S. 126, 133 (2010). Accordingly, the "Necessary and Proper Clause makes

clear that the Constitution's grants of specific federal legislative authority"—including the Commerce Clause—"are accompanied by broad power to enact laws that are convenient, or useful or conducive, to the authority's beneficial exercise." *Id.* at 133-34 (quotations omitted). A court may "only invalidate a congressional enactment passed pursuant to the Commerce Clause if it bears no rational relation to interstate commerce." *United States v. Faasse*, 265 F.3d 475, 481 (6th Cir. 2001). Accordingly, "[i]n assessing the scope of Congress' authority under the Commerce Clause," the Court's "task" is a "modest one." *Raich*, 545 U.S. at 22.

The CTA's reporting requirements are authorized by the Commerce and Necessary and Proper Clauses. "Congress's power to regulate activities that substantially affect interstate commerce" allows Congress "to regulate two related classes of activity." *Thomas More L. Ctr.*, 651 F.3d at 541-42. First, Congress may "regulate even non-economic intrastate activity if doing so is essential to a larger scheme that regulates economic activity." *Id.* at 542; *see also Raich*, 545 U.S. at 18 (may regulate such activity if its failure to do so "would undercut" the regulation of interstate commerce). Second, "Congress may regulate economic activity, even if wholly intrastate, if it substantially affects interstate commerce." *Thomas More L. Ctr.*, 651 F.3d at 542.

The CTA falls comfortably within both categories. First, the CTA's reporting requirements are a key component of the government's comprehensive anti-money laundering regime. Second, the CTA directly regulates economic activity that substantially affects interstate commerce.

**1.** The CTA's reporting requirements form a critical part of the federal government's comprehensive anti-money laundering regime. "Money laundering is a quintessential economic activity." *See United States v. Goodwin*, 141 F.3d 394, 399 (2d Cir. 1997). "Money laundering harms society by 'disbursing capital from lawfully operating economic institutions to criminals in and out of the country.'" *United States v. Gonikman*, 2012 WL 1893501, at *2 (E.D. Mich. May 23, 2012) (quoting *United States v. Beddow*, 957 F.2d 1330, 1339 (6th Cir. 1992)). Plaintiffs do

not dispute that Congress may prohibit money laundering and other harmful forms of economic activity. *See* 18 U.S.C. §§ 1956, 1957 (prohibiting money laundering); *id.* § 2339C (prohibiting financing for terrorism); 26 U.S.C. § 7201 (prohibiting tax evasion). "Indeed, it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity." *Goodwin*, 141 F.3d at 399.

Various economic crimes—including money laundering, terrorism financing, and tax fraud—may be facilitated by legal entities that may conduct economic transactions in their own names without disclosing "information about the[ir] beneficial owners." NDAA § 6402(2). As Congress determined, "malign actors" can thus "conceal their ownership of corporations" and use them to conduct illicit transactions without detection. *Id.* § 6402(3). Many criminals exploit this information gap: "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies," and drug traffickers "commonly use shell and front companies to commingle illicit drug proceeds with legitimate revenue of front companies, thereby enabling the [traffickers] to launder their drug proceeds." 87 Fed. Reg. at 59,503.

In response, Congress passed the AMLA. The AMLA, of which the CTA is a part, aims "to modernize" existing federal legislation seeking to combat "money laundering and counter[] the financing of terrorism." NDAA §§ 6001, 6002(2), 6401.

The CTA fills an important gap in Congress's comprehensive regime to prevent money laundering by establishing "uniform beneficial ownership information reporting requirements." *Id.* § 6002(5). In particular, the statute requires corporate entities—entities that have the ability to engage in commercial transactions in their own name—to disclose the identities of those who created such entities and those who own or control them.

Congress determined that this information "is needed" to "protect interstate and foreign commerce" and "counter money laundering, the financing of terrorism, and other illicit activity." NDAA § 6402(5).  Congress further determined that this information would "discourage the use of shell corporations as a tool to disguise and move illicit funds" and assist "law enforcement agencies with the pursuit of crimes."  *Id*. § 6002(5).  These congressional findings rest on an extensive legislative record that demonstrated that "efforts to investigate corporations and [LLCs] suspected of committing crimes have been impeded by the lack of available beneficial ownership information."  H.R. Rep. No. 116-227, at 2.

Failure to include the CTA in the AMLA would have left a "gaping hole" in Congress's anti-money laundering efforts.  *See Raich*, 545 U.S. at 22.  "[I]f left unregulated in the aggregate," the absence of corporate reporting requirements "could work to undermine Congress's ability to regulate [a] larger interstate commercial activity"—*e.g.*, money laundering, terrorism financing, and tax evasion.  *United States v. Bowers*, 594 F.3d 522, 529 (6th Cir. 2010) (upholding regulation of non-commercial activity where failure to do so would undercut ability to enforce comprehensive regulatory regime).

Plaintiffs ignore the AMLA and the fact that the CTA was enacted as an essential part of that comprehensive, anti-money laundering regulatory regime.  A district court in another district made a similar mistake.  *See Nat'l Small Bus. United v. Yellen*, 2024 WL 899372, at *17 (N.D. Ala. Mar. 1, 2024) ("*NSBU*"), *appeal filed*, No. 24-10736 (11th Cir. Mar. 11, 2024).  That decision, which the government has appealed, acknowledged that "Congress has substantial leeway to regulate purely intrastate activity (whether economic or not) that it deems to have the capability, in the aggregate, of frustrating the broader regulation of interstate economic activity."  *Id.* at *16 (cleaned up).  But that district court nonetheless believed that the CTA was an isolated, "single-subject statute" such that the "'comprehensive regulatory scheme' framework" did not apply.  *Id.*

at *17 (quotations omitted).  Plaintiffs do not press that argument, which disregards the CTA's role as an important part of the AMLA.  Nor do Plaintiffs assert, as the *NSBU* court held, that the "CTA is far from essential" on the basis that certain financial institutions are required to retain certain beneficial-owner information about their customers pursuant to a 2016 rule.  *See id.* (citing 31 C.F.R. § 1010.230(a)).  Congress reasonably determined that the CTA's disclosure requirements were "needed" notwithstanding the 2016 rule, which only applies to entities that choose to become customers of a comparatively narrow set of institutions and only requires those institutions to retain, but not transmit to the government, certain customer information.  NDAA § 6402(5); 87 Fed. Reg. at 59,548 (explaining how Congress addressed relationship between the CTA and the 2016 rule); *see also* 31 C.F.R. § 1010.605(e) (defining a "[c]overed financial institution").

Plaintiffs nonetheless maintain that the CTA is not "a valid component of a comprehensive regulatory regime" because (1) the CTA "regulate[s] *inactivity*," Pls.' Br., PageID.702 (emphasis added), and (2) "it applies solely to noncommercial, intrastate *activity*: the mere *act* of corporate formation," *id.* at PageID.703 (emphasis added).  For starters, Plaintiffs admit that the CTA regulates activity; even under Plaintiffs' (inaccurate) characterization of the CTA, it regulates "activity" in the form of "corporate formation."  *Id.*  And as explained below, *see infra* pp. 12-15, the law does not regulate the act of incorporation itself, but rather imposes reporting requirements for various incorporated and registered entities under certain circumstances.

Further, Plaintiffs' assertion that the CTA regulates inactivity rests on the flawed analogy to *NFIB*.  There, the Court explained that Congress "has never attempted to rely on [the Commerce Clause] to compel individuals not engaged in commerce to purchase an unwanted product."  567 U.S. at 549; *see also id.* at 556-57 (mandate directed at individuals "whose commercial inactivity rather than activity is [their] defining feature").  Here, Congress is not requiring individuals or

entities to engage in commercial transactions in which they would prefer not to engage; Congress is doing just the opposite, regulating individuals and entities that have taken a variety of affirmative steps, including incorporating, registering to do business, and changing ownership interests in a commercial entity. Further, unlike the "novelty" of the regulation in *NFIB*, *see id.* at 549, "[r]egulation requiring the submission of information" is a "familiar category" of federal legislation, *Elec. Bond & Share Co. v. SEC*, 303 U.S. 419, 437 (1938). *See, e.g.*, 26 U.S.C. § 6012 (requiring taxpayers to file tax returns); 31 U.S.C. § 5311 *et seq.* (requiring banks to report information about certain transactions).

Because the CTA's reporting requirements are a critical "part of a larger comprehensive scheme to regulate [the] illicit interstate market" of money laundering and other economic crimes, Congress had authority to enact the CTA. *Bowers*, 594 F.3d at 528.

**2.** The CTA is authorized by Congress's power to regulate commerce for another, independent reason: the CTA itself regulates economic activity with a substantial effect on interstate commerce. The Supreme Court has distinguished between laws that (i) regulate activity with an "apparent commercial character," *United States v. Morrison*, 529 U.S. 598, 611 & n.4 (2000), and those that (ii) regulate activity which has "nothing to do with 'commerce' or any sort of economic enterprise," *United States v. Lopez*, 514 U.S. 549, 561 (1995), and which are "not, in any sense of the phrase, economic activity," *Morrison*, 529 U.S. at 613. The CTA falls squarely on the "apparent commercial character" side of the line.

Contrary to Plaintiffs' assertions, the law does not regulate the mere act of corporate formation. Rather, it is a reporting requirement applicable to certain "corporation[s]" and "similar entit[ies]" authorized to do business in the United States, including those that were never incorporated in the United States and those that were incorporated years ago. 31 U.S.C. § 5336(a)(11)(A). Incorporation is a necessary predicate to the application of the CTA's reporting

requirements, but it is not itself an object of the CTA. Businesses that were incorporated years ago are subject to the reporting requirement for at least as long as they remain operational. *See id.* § 5336(b)(1)(B). Further, covered entities must report changes in ownership on an ongoing basis. *See id.* § 5336(b)(1)(D). And some foreign businesses are subject to the CTA if they then "register[] to do business in the United States." *Id.* § 5336(a)(11)(A)(ii).

The universe of entities subject to the CTA's reporting requirements confirms that the statute is a valid commercial regulation. Those requirements cover corporations and other legal entities legally authorized to conduct commercial transactions, and exclude many trusts, political organizations, and non-profits, as well as many entities that are no longer "engaged in active business" or "otherwise hold[ing] any kind or type of assets." 31 U.S.C. § 5336(a)(11)(B)(xix), (xxiii).

Plaintiffs' focus on edge cases and possible exceptions therefore misses the forest for the trees. For one, *all* of the Plaintiffs in this action are themselves engaged in commerce. *See* Compl. ¶ 14, PageID.8; *id.* ¶ 26, PageID.11; Verification of Derek Dickow, ¶¶ 2-3, PageID.35; Verification of Timothy A. Eisenbraun, ¶ 2, PageID.34. Because Plaintiffs conduct commercial activity, they cannot rest their claim on a theory that the CTA might apply to a hypothetical entity that does not exist. *See Sabri v. United States*, 541 U.S. 600, 609 (2004) (rejecting overbreadth challenge when challenging parties "were well within the limits of legitimate congressional concern").

Plaintiffs do not identify any other noncommercial entity subject to the CTA's reporting requirements—let alone a sufficient number to cast doubt on the statute's status as a commercial regulation. Plaintiffs assert that it is somehow improper for the CTA to apply to "homeowners' associations, entities formed to hold a family residence for estate-planning purposes, non-profit entities that have not yet sought 501(c) federal tax-exempt status, or entities such as local private

social clubs." Pls.' Br., PageID.671. Putting aside the fact that many neighborhood associations and social clubs would qualify as non-profits under "section 501(c) of the Internal Revenue Code" and not be covered by the CTA, *see* 31 U.S.C. § 5336(a)(11)(B)(xix)(I), the function of the hypothesized clubs and associations is presumably to acquire event space, purchase food and similar commodities, and perform other economic transactions, *see Katzenbach v. McClung*, 379 U.S. 294, 302 (1964) (sustaining under the Commerce Clause legislation regulating local restaurants). And "entities formed to hold a family residence" present an even easier case; purchasing, selling, and retaining real property is undoubtedly a commercial activity.

Plaintiffs' inability to identify a single covered entity that is *not* engaged in commerce negates their contention that, "[i]n *every* application," the CTA "applies solely to noncommercial" entities. Pls.' Br., PageID.703 (emphasis added). Even a handful of examples would be insufficient. *See Sabri*, 541 U.S. at 608 (warning, in the context of an enumerated-powers challenge, that "laws should not be invalidated by reference to hypothetical cases" (quotations omitted)). The Court has "never required Congress to legislate with scientific exactitude," *Raich*, 545 U.S. at 17; rather, "[w]hen the larger 'general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence,'" *Bowers*, 594 F.3d at 528 (quoting *Raich*, 545 U.S. at 17). That is especially so where, as here, the "total incidence of a practice"—the formation of entities that may engage in commercial activity while hiding the identities of their beneficial owners—"poses a threat to a national market." *Raich*, 545 U.S. at 17 (quotations omitted).

On the mistaken premise that the CTA regulates the mere act of corporate formation, Plaintiffs argue that the law improperly impedes on a "quintessential[]" "zone of state—not federal—regulation." Pls.' Br., PageID.702 (citing *NSBU*, 2024 WL 899372, at *8). But the CTA

does not purport to override or preempt any state-law incorporation provisions.  *See NSBU*, 2024 WL 899372, at *8 ("[T]he CTA is not a direct regulation of corporate formation.").

**3.**   The CTA is further authorized by the Commerce Clause because it regulates the channels of, and entities in, interstate commerce.  Congress "has undoubted power" to prevent the channels of interstate commerce from becoming "conduits for promoting or perpetuating economic evils."  *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 99 (1946); *see also N. Am. Co. v. SEC*, 327 U.S. 686, 705-06 (1946).  Covered entities utilize the channels of interstate commerce, including telecommunications and electronic bank routing systems.  NDAA §§ 6002, 6402.  Plaintiffs assert that the CTA does not target the "channels" or "instrumentalities" of interstate commerce, but they do not address the cases set forth above.  *See* Pls.' Br., PageID.699.

**4.**   For the same reasons, the CTA is authorized by Congress's power to regulate foreign commerce under the Foreign Commerce and Necessary and Proper Clauses.   "The plenary authority of Congress to regulate foreign commerce, and to delegate significant portions of this power to the Executive, is well established."  *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 59 (1974) (citations omitted).   The "Founders intended the scope of the foreign commerce power to be … greater" than the interstate commerce power.  *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 (1979); *but see United States v. Rife*, 33 F.4th 838, 844 (6th Cir. 2022) (declining to apply substantial-effects test in context of Foreign Commerce Clause).  At a minimum, the Foreign Commerce Clause includes "the power to punish acts that interfere with, obstruct, or prevent the due exercise of the power to regulate commerce and navigation with foreign nations, and among the states."  *Rife*, 33 F.4th at 843 (quotations omitted).  And here Congress expressly found that the CTA "is needed to … protect … foreign commerce."  NDAA § 6402(5)(C).

### B. The CTA Is Authorized by Congress's Power to Regulate Foreign Affairs and Ensure National Security.

The CTA is authorized by Congress's law enforcement and national security powers, as well as such powers vested in the Executive. "Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963), and national security, *see Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017). Courts are reluctant to declare a statute unconstitutional where it "implicates sensitive and weighty interests of national security and foreign affairs." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010).

In enacting the CTA, Congress concluded that collecting beneficial ownership information "is needed to … protect vital Unite[d] States national security interests," including to "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards," NDAA § 6402(5), specifically those set by the Financial Action Task Force, H.R. Rep. No. 116-227, at 11.[5]

Plaintiffs' argument primarily relies on *Bond v. United States*, 572 U.S. 844 (2014). *See* Pls.' Br., PageID.704-05. *Bond* is far afield. First, *Bond* involved statutory interpretation, and did not involve the constitutional question of Congress's broad foreign affairs and national security powers. *See* 572 U.S. at 856. Second, *Bond* involved a "purely local crime," described as an "unremarkable local offense." *See id.* at 848. Here, the CTA is necessary to prevent money laundering and terrorism financing—economic crimes with significant national security implications.

### C. The CTA Is Authorized by Congress's Power to Lay and Collect Taxes.

The CTA's reporting requirement is also a necessary and proper exercise of the

---

[5] The Financial Action Task Force is the global standard-setting body for combating money laundering, terrorist financing, and other illicit finance threats.

government's authority to lay and collect taxes. U.S. Const. art. I, § 8, cl. 1. Congress may enact legislation designed to facilitate tax collection. *See Helvering v. Mitchell*, 303 U.S. 391, 399 (1938). Congress has given the Internal Revenue Service ("IRS") "broad power to require the submission of tax-related information that it believes helpful in assessing and collecting taxes." *CIC Servs., LLC v. IRS*, 593 U.S. 209, 212 (2021). Here, for example, Congress determined that the lack of ownership information allows criminals to obscure their income and assets and thus "facilitate[s] … serious tax fraud." NDAA § 6402(3). Congress found that the reporting requirements would be "highly useful" in enabling investigators to detect tax fraud, 31 U.S.C. § 5336(a)(11)(B)(xxiv), and in improving "tax administration" generally, *id.* § 5336(c)(5)(B). The CTA's reporting requirements therefore aid the government's ability to assess and collect taxes. *See Jinks v. Richland County*, 538 U.S. 456, 462 (2003) (no requirement that statute be "absolutely necessary" to regulatory regime to uphold under Necessary and Proper Clause); *Comstock*, 560 U.S. at 133-34 (sufficient if statute is "convenient, or useful" (quotations omitted)); *cf. Shultz*, 416 U.S. at 26 (upholding Bank Secrecy Act reporting requirements that "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings" (quotations omitted)). Because the CTA's information reporting is comparable to other valid reporting requirements, the *NSBU* court's concern that it would be a "substantial expansion of federal authority" is misplaced. 2024 WL 899372, at *21.

Plaintiffs counter that, even if "federal tax officials might obtain information" because of the CTA, "that is only as a side-effect" of the law, which primarily serves other aims. Pls.' Br., PageID.705. The fact that Congress derives its authority to enact legislation from multiple sources does not minimize the scope of its taxing power. "[A] law does not stop being a valid tax measure just because it also serves some other goal." *United States v. Bolatete*, 977 F.3d 1022, 1032 (11th Cir. 2020). Here, it is undisputed that the CTA's reporting requirements play a significant role in

preventing tax evasion. That is all that is required. *See Sonzinsky v. United States*, 300 U.S. 506, 513 (1937) (finding "registration provisions … obviously supportable as in aid of a revenue purpose").

## II.    THE CTA DOES NOT VIOLATE THE FOURTH AMENDMENT.

The Supreme Court has long recognized that uniform statutory reporting requirements of the kind at issue here—which do not give federal officers the discretion to arbitrarily influence the manner, frequency, or objects of a given search, and cover a limited set of information deemed necessary by Congress—are consistent with the Fourth Amendment. What little Plaintiffs have to say about the Supreme Court's leading case on reporting requirements (mentioned nearly twenty pages into their argument) is not to the contrary. The Court should not mistake the volume of Plaintiffs' briefing for substance: the CTA fits comfortably within the framework for such reporting requirements approved by the Supreme Court, and it should be upheld against Fourth Amendment challenge.

### A.    The CTA Is Consistent with the Fourth Amendment Standards Applicable to Such Reporting Requirements.

"As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995); *see also Maryland v. King*, 569 U.S. 435, 446-47 (2013) ("The Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances …." (quotation and alteration omitted)). The Supreme Court's leading case on the application of this test to reporting requirements like the CTA is *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974).

**1.** *Shultz* involved a Fourth Amendment challenge to a reporting requirement of the Bank Secrecy Act (BSA). Among the challenged BSA provisions in *Shultz* was a requirement that banks make "certain reports of domestic transactions [to the government] where such reports have a high

degree of usefulness in criminal, tax, or regulatory investigations." 416 U.S. at 30-31, 37. For each covered transaction, the BSA required the bank to disclose "the name, address, business or profession and social security number of the person conducting the transaction," among other information. *Id.* at 39 n.15. Congress created these "precise and detailed reporting requirements," *id.* at 27, to address "the use of financial institutions, both domestic and foreign, in furtherance of activities designed to evade" U.S. law., *id.* at 38; *see also id.* at 26-27 ("Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions.").

The Supreme Court concluded that these BSA reporting requirements were reasonable and fully consistent with the Fourth Amendment. The Court started by connecting its Fourth Amendment analysis to the specific context of corporate reporting requirements, where it has long been clear "that organizations engaged in commerce c[an] be required by the Government to file reports dealing with particular phases of their activities." *Id.* at 65; *see also id.* at 59 ("Since a statute requiring the filing and subsequent publication of a corporate tax return has been upheld against a Fourth Amendment challenge, reporting requirements are by no means per se violations of the Fourth Amendment." (citation omitted)). As to the BSA's constitutionality, the Court's rationale had two primary components: the information required to be reported was "[1] sufficiently described and limited in nature, and [2] sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce," such that the BSA "d[id] not impose unreasonable reporting requirements" under the Fourth Amendment. *Id.* at 67.

**2.** *Shultz* establishes the proper Fourth Amendment rubric applicable to the CTA, which takes a similar form and arose in similar circumstances. Just like the BSA, the CTA requires companies to "file reports dealing with particular phases of their activities." *Id.* at 65. Like the

BSA, the CTA was motivated by increasing use of covered entities for illicit purposes: "For more than two decades, the U.S. Government has documented the use of legal entities by criminal actors … for ultimately illicit ends." 87 Fed. Reg. at 59,498; *see also id.* (stating that recent "events have reinforced the threat that abuse of corporate entities, including shell or front companies, by illicit actors and corrupt officials presents to the U.S."). And Congress designed the CTA's reporting requirements, like those of the BSA, to yield information that would be "highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute" money laundering and other financial crimes. 31 U.S.C. § 5336(a)(11)(B)(xxiv).

Applying *Shultz*'s Fourth Amendment rubric to the CTA confirms its constitutionality. The information required to be reported under the CTA is "sufficiently described" and "limited." *Shultz*, 416 U.S. at 67. The statute and its authorized regulations "address, among other things: who must file; when they must file; and what information they must provide." 87 Fed. Reg. at 59,500. That information is strikingly similar to that required to be reported under the BSA: the names, addresses, and identification numbers of certain involved individuals. *See* 31 U.S.C. § 5336(b)(2). Plaintiffs lack a material, concrete privacy interest in such information: the individual Plaintiffs readily concede that the Government already has their "passport numbers," Pls.' Br., PageID.680, and do not meaningfully contest that they already provide the Government with information like their names and addresses pursuant to other tax or regulatory requirements.[6] The sole piece of information they assert is not already disclosed is "the *relationship* between" their identity and their ownership interest in a covered entity. *Id.* But the BSA too required

---

[6] *See, e.g.*, IRS, Form 1040, https://perma.cc/YR59-EBXP; U.S. Dep't of State, Application for a U.S. Passport, https://perma.cc/8BFM-XJKS; *Corporations*, Licensing and Regulatory Affairs, State of Michigan, https://www.michigan.gov/lara/bureau-list/cscl/corps/corporations/intro/corporations (noting that disclosure of the "[n]ame and business or residence address of the incorporators" is required "[i]n order to form a corporation"); 87 Fed. Reg. at 59,519 ("[D]isclosures of this type already occur regularly in a variety of circumstances.").

disclosure of the "relationship" between the identity of bank customers and the covered transactions, a fact that did not change the Court's analysis in *Shultz*. *See also United States v. Miller*, 425 U.S. 435, 442 (1976) (no expectation of privacy in checks required to be reported under the BSA because they were merely "instruments to be used in commercial transactions").

Nor is a person's ownership interest in a company the sort of "commercially sensitive information" for which society generally recognizes corporate privacy interests, *MA LEG Partners 1 v. City of Dallas*, 442 F. Supp. 3d 958, 967 (N.D. Tex. 2020)—an analysis which Plaintiffs' own cases apply, *see Patel v. City of Los Angeles*, 738 F.3d 1058, 1062 (9th Cir. 2013) (finding an expectation of privacy in hotel records including "commercially sensitive information" such as "customer lists, pricing practices, and occupancy rates"). The Court should not credit Plaintiffs' unadorned speculation that disclosure "could invite political retaliation" or other undefined bad acts on the part of the Government. Pls.' Br., PageID.676. Nor should it credit Plaintiffs' conjecture, unaccompanied by any facts or authority, that information about whether an entity is "backed by … a famous or an infamous public figure" is commercially sensitive because it could "affect the company's ability to enter into certain contracts."[7] *Id.* That is especially true because the CTA does not require disclosure of why any individual qualifies as a beneficial owner. Therefore, the reported information would not show whether the entity is actually "backed" by a public figure, or whether that person has only "contingent future ownership interests" or an officer position or any other of a number of possible arrangements. *Id.* Plaintiffs' assertion that CTA reports reveal the "internal dynamics" of companies is misleading for the same reason, *id.* at PageID.677; such reports show only the list of persons defined as "beneficial owners" under the statute, not the nature or extent of each person's interest. *See* 31 U.S.C. § 5336(b)(2); 31 C.F.R.

---

[7] Plaintiffs do not allege, much less show, that information regarding any such infamous public figure is at issue here.

§ 1010.380(b)(ii). The CTA also establishes safeguards to "protect the security and confidentiality" of reported information, including requiring any entity receiving such information to restrict access, implement security measures, and comply with other protocols. 31 U.S.C. § 5336(c)(3).

The information required to be reported by the CTA is moreover "sufficiently related to a tenable congressional determination as to improper use," of the corporate form in interstate commerce. *Shultz*, 416 U.S. at 67. As Congress found when it created the CTA, "malign actors seek to conceal their ownership of corporations, [LLCs], or other similar entities in the United States to facilitate illicit activity," and "money launderers and others involved in commercial activity intentionally conduct transactions through corporate structures in order to evade detection." NDAA § 6402(3)-(4). As a result, Congress concluded, "legislation providing for the collection of beneficial ownership information for … [such] entities formed under the laws of the States is needed" to "protect vital United States national security interests," "protect interstate and foreign commerce," and "enable … law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity," among other reasons. NDAA § 6402(5).

Consistent with *Shultz*, Congress routinely enacts reporting requirements, including as to information used for law enforcement purposes. For example, federal law requires employers to collect and make available information about new employees' eligibility to work. *See* 8 U.S.C. § 1324a(b) (employment verification reporting requirements); *id.* § 1324a(f) (criminal penalties). Political campaigns are required to report contributions and expenditures. *See* 52 U.S.C. § 30104; *id.* § 30107(a)(9) (FEC may "report apparent violations to the appropriate law enforcement authorities"). Taxpayers, of course, are required to file tax returns. *See* 26 U.S.C. § 6012. Plaintiffs have identified no authority casting Fourth Amendment doubt on such enactments. And their contention that tax return information "cannot be disclosed by the IRS to federal prosecutors

absent a court order," Pls.' Br., PageID.687, is incorrect: the tax laws permit disclosure of tax return information to the Department of Justice "for purposes of tax administration," including in "determining the taxpayer's … criminal liability," without judicial process.   26 U.S.C. § 6103(h)(2)(A).

**3.**     Under Plaintiffs' contrary argument, vast swathes of federal law would be constitutionally suspect, and *Shultz* itself would be wrongly decided.  Plaintiffs argue first that *Shultz* only upheld the BSA because it targeted "suspicious" transactions, analogous to the "reasonable suspicion" required for *Terry* stops,[8] and they construe the CTA as targeting "suspicionless" entity formations.  Pls.' Br., PageID.691.  Not so.  The Supreme Court in *Shultz* did not characterize the large currency transactions subject to reporting under the BSA as "suspicious," nor import any "suspicion"-based analysis from Fourth Amendment caselaw governing discretionary searches such as *Terry*.  Indeed, it observed that the BSA's requirements could affect "millions of legitimate businessmen."  *Shultz*, 416 U.S. at 30.  Instead, the Court concluded that what mattered was that Congress sufficiently linked those large currency transactions "to improper use of transactions of that type in interstate commerce, so as to withstand the Fourth Amendment challenge."  *Id.* at 67.  Congress did the same as to the CTA.  *See supra* p. 22.  It moreover connected the CTA to the set of entities presenting an increased risk of use as shell companies: small businesses that are often not subject to existing reporting requirements.  *See* 87 Fed. Reg. at 59,501; 31 U.S.C. § 5336(a)(11)(B) (excluding various public and other entities already subject to reporting requirements).

Plaintiffs next argue that the BSA's reporting requirements did not have "crime control" as a primary purpose, making *Shultz* more analogous to "administrative search" cases dealing with

---

[8] "The Fourth Amendment's prohibition on 'unreasonable ... seizures,' U.S. CONST. amend. IV, allows temporary investigative detentions, known as *Terry* stops," upon reasonable suspicion of criminal activity.  *United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022).

discretionary searches where the governmental interest was "distinguishable from the general interest in crime control." *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) (quotation omitted). The barest glance at *Shultz* disproves this assertion, as the Supreme Court repeatedly explained that the BSA arose because of "the heavy utilization of our domestic banking system by the minions of organized crime." *Shultz*, 416 U.S. at 30; *see also id.* at 26-27 ("Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions."). There, as here, Congress determined that the reporting requirements were necessary "in ferreting out criminal activity and desired to strengthen the statutory basis for requiring such reports." *Id.* at 38. Plaintiffs' attempt to distinguish *Shultz* because the reports were made to the IRS, rather than "directly to a criminal law enforcement agency," falls flat: the BSA, just like the CTA, permitted the agency to share reported information with law enforcement agencies under appropriate circumstances. *See* CFTRA § 212 (stating that, pursuant to agency regulation, "any information set forth in reports filed pursuant to this title" may be made available "to any other department or agency of the Federal Government").[9]

Finally, Plaintiffs suggest that *Shultz* cannot govern here because the Supreme Court only reached the merits of the bank plaintiffs' claims, dismissing the claims of the individual plaintiffs for lack of standing. 416 U.S. at 67-70. But Plaintiffs cite no case so limiting *Shultz*. Moreover, as described herein, application of the Fourth Amendment rubric set out in *Shultz* to the claims of individuals comes out the same way, and Plaintiffs do not even attempt to show otherwise. As Plaintiffs admit, the Court later rejected Fourth Amendment challenges to the BSA by individuals for the threshold reason that individuals lack a sufficient privacy interest in their transactional

---

[9] The relevant BSA reports are now made to FinCIN, not the IRS—a fact that has not changed the statute's constitutionality. *See* 31 C.F.R. § 1010.306(a)(1).

documents in the first place, a result that certainly lends no support to Plaintiffs' claims here. *See Miller*, 425 U.S. at 443.

**4.** Plaintiffs' dogged insistence that "a warrantless search is unconstitutional" in the absence of a formally "recognized exception to the warrant requirement," Pls.' Br., PageID.686, simply cannot be squared with *Shultz* or with the many other statutory reporting requirements that have long been understood as constitutional.[10] While Plaintiffs may hold such a view, they cannot prevail on such a theory: "the Court is constitutionally obligated to adhere to existing Supreme Court precedent." *Evans v. Kelley*, 977 F. Supp. 1283, 1319 n.38 (E.D. Mich. 1997).

The requirements for a warrant or a certain level of suspicion Plaintiffs seek to import into cases involving statutory reporting schemes come from—and are applicable to—cases involving discretionary and often physical searches. In cases where agencies or officers have discretion to control the timing, manner, scope, and frequency of individual searches, an opportunity for pre-compliance review may mitigate any risk of abuse or harassment. *See Brock v. Emerson Elec. Co.*, 834 F.2d 994, 996 n.2 (11th Cir. 1987) (differentiating cases "involv[ing] discretionary and potentially arbitrary requests for document inspection," where a subpoena may be required, with "cases in which businesses or individuals are required to report particular information to the government on a regular basis," like *Shultz*). For instance, Plaintiffs rely heavily on *Patel*, which concerned on-demand "inspections" of hotel guest records by city police. 576 U.S. at 412-14. The Supreme Court required pre-compliance review because of a "risk that searches … will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests," such as a hotel being "searched 10 times a day, every day, for three months." *Id.* at 421; *see also id.* at 423 ("[T]he

---

[10] Alternatively, if such a formal "recognized exception" was required, *Shultz* itself would evince the existence of such an exception applicable to reporting requirements like those in the BSA and CTA. In any event, the Court need not resolve such semantic differences in framing; it need only apply the Supreme Court's reasoning.

availability of precompliance review … reduces the risk that officers will use these administrative searches as a pretext to harass business owners.").  In the *Terry* stop cases Plaintiffs cite, the Supreme Court similarly mandated "reasonable suspicion" to prevent persons from being "subject to arbitrary invasions solely at the unfettered discretion of officers in the field."  *Brown v. Texas*, 443 U.S. 47, 51 (1979).  And so on for the discretionary searches at issue in Plaintiffs' other cases, whether administrative searches or otherwise.  *See, e.g.*, *Free Speech Coal., Inc. v. Att'y Gen. United States*, 825 F.3d 149, 166, 168 (2016) (searches of "private offices, storage rooms, and residences" were "at law enforcement's discretion"); *Taylor v. City of Saginaw*, 11 F.4th 483 (6th Cir. 2021) (officers exercising discretion to mark car tires); *United States v. Sturm, Ruger & Co.*, 84 F.3d 1 (1st Cir. 1996) (OSHA exercising discretion to issue subpoenas).

Indeed, as contrasted with cases involving "an arbitrary and discretionary demand to inspect company records," the Sixth Circuit and others have recognized the permissibility of "a warrantless inspection" in the form of "reporting requirement[s]" like those at issue in *Shultz*. *McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 994-95 (6th Cir. 1988); *see also Brock*, 834 F.2d at 996 n.2 (observing that in cases like *Shultz*, "a uniform statutory or regulatory reporting requirement satisfies the Fourth Amendment concern regarding the potential for arbitrary invasions of privacy"); *Donovan v. Master Printers Ass'n*, 532 F. Supp. 1140, 1153 (N.D. Ill. 1981) (upholding Labor Management Reporting and Disclosure Act requirements and stating that the Fourth Amendment "simply requires that the reporting scheme imposed by the statute bear a reasonable relationship to a permissible subject of governmental inquiry and not place an undue burden on the defendant").  This distinction is present in *Shultz* itself.  *See Shultz*, 416 U.S. at 62 (stating that "[u]nlike the situation in" other cases dealing with defective warrant procedures, the BSA "do[es] not authorize indiscriminate rummaging among the records of the plaintiffs").

Here, the CTA requires reporting of specific information under specific statutory criteria, rather than providing field officers with leave to conduct limitless, discretionary searches of Plaintiffs' persons or files.  *See* 31 U.S.C. § 5336(b).  Like the BSA provisions at issue in *Shultz*, it does not create the risk of pretextual or arbitrary harassment or abuse present in *Patel* and similar cases.  Plaintiffs unpersuasively attempt to portray the CTA's reporting requirements as discretionary because the government can promulgate regulations exempting entities from the statute's scope.  *See* 31 U.S.C. 5336(a)(11)(B)(xxiv).  But nothing about that regulatory authority permits the agency to pretextually harass regulated entities, or to engage in searches "exceed[ing] statutory limits," *Patel*, 576 U.S. at 421, contradicting Plaintiffs' contention that the CTA is the same as having "thousands of police officers [] force open those businesses' doors and review their records in person," Pls.' Br., PageID.693 (citing *Patel*).  Moreover, the BSA provided the same authority to create regulatory exemptions, which did not trouble the Supreme Court in *Shultz*.  *See* CFTRA § 206 ("The Secretary may make such exemptions from any requirement otherwise imposed under this title as he may deem appropriate.").

The out-of-circuit district court decision involving a reporting requirement that Plaintiffs invoke only underscores the absence of support for their position.   In *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019), the district court concluded that Airbnb established a preliminary likelihood that some form of pre-compliance review was necessary in the context of a New York City ordinance requiring "booking services" to submit monthly reports of all "transactions for which they receive fees."[11]  *Id.* at 474.  But the reporting requirement in *Airbnb* bears no resemblance to the CTA.  For one thing, the *Airbnb* court relied on its finding that "the scale of the production that the Ordinance compels each booking service to make is

---

[11] The *Airbnb* court never reached a final conclusion on this question, as the City later amended the ordinance during summary judgment briefing and the case settled.  *See HomeAway.com, Inc. v. City of New York*, 523 F. Supp. 3d 573, 582-83 (S.D.N.Y. 2021).

breathtaking"—the ordinance would have compelled Airbnb to "produce user data as to each of the more than 700,000 bookings" it processed that year, amounting to a "wholesale regulatory appropriation of a company's user database."  373 F. Supp. 3d at 490-91, 494-95; *see also id.* at 494 (concluding that "the expansive user records required [to] be produced cannot be credibly described as limited in scope").  The CTA, like the BSA in *Shultz*, requires reporting of information that is far more "limited in nature," 416 U.S. at 67, and there is little danger that a small business will be compelled to make even a meaningful fraction of 700,000 reports per year, *see, e.g.*, 87 Fed. Reg. at 59,529 ("Most reporting companies will have relatively small numbers of (or no) employees or simple management and ownership structures.").[12]  For another thing, the *Airbnb* ordinance included no finding—like the congressional findings supporting the BSA and CTA— that the information was necessary to combat "improper use of transactions of that type."  *Shultz*, 416 U.S. at 67.

**5.**  Plaintiffs wrongly seek to cast the CTA as a product of "technological" advancement, citing recent Supreme Court cases like *Carpenter v. United States*, 585 U.S. 296 (2018), that apply the Fourth Amendment to searches achieved through technological innovation unknown to previous generations.  Pls.' Br., PageID.693-94.  The only "advanced" technology involved in the CTA's reporting requirements is the submission of reports to the agency on its website.  *See* 87 Fed. Reg. at 59,508.  That a completed PDF report can be filed online, rather than sent through the mail, is not an "innovat[ive]" "surveillance tool[]" newly available due to "seismic shifts" in search technology, as in Plaintiffs' cases.[13]  *Carpenter*, 585 U.S. at 305, 313.  Moreover, the technology

---

[12] Filing is free, and for the majority of covered entities, the value of the time spent to prepare and file an initial beneficial ownership report is expected to be only around $85, *see* 87 Fed. Reg. at 59,562, a far cry from the "breathtaking" burden identified by the court in *Airbnb*, 373 F. Supp. 3d at 490.

[13] Indeed, BSA reports have been submitted online for over a decade.  *See Notice on E-Filing Mandate*, FinCEN (Mar. 7, 2013), https://www.fincen.gov/news/news-releases/notice-e-filing-mandate.

in *Carpenter* provided "a comprehensive dossier of [a person's] physical movements." 585 U.S. at 315; *see also Kyllo v. United States*, 533 U.S. 27 (2001) (thermal imaging of a person's home). The information required to be reported under the CTA—in relevant part, the beneficial owners and applicants of certain companies and similar entities—is far less detailed and far less sensitive. *See supra* pp. 20-22.

Finally, Plaintiffs are incorrect that the Government's position "has no limiting principle." Pls.' Br., PageID.695. Consistent with *Shultz*, the Government's contention is only that the Fourth Amendment permits reporting requirements covering information "sufficiently described and limited in nature, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce." *Shultz*, 416 U.S. at 67. The fact that the limited reporting requirements at issue here readily satisfy the Fourth Amendment's reasonableness test does not establish that the same would be true of more intrusive investigative techniques such as DNA swabbing, *see Maryland v. King*, 569 U.S. 435 (2013), or raids of "private offices, storage rooms, and residences," *Free Speech Coalition*, 825 F.3d at 168. Nor does it establish the constitutionality of searches "that provide a comprehensive chronicle" of a person's life, *Carpenter*, 585 U.S. at 300.

In *Shultz*, the Supreme Court already determined what Fourth Amendment analysis is applicable to statutory reporting requirements, and the CTA is constitutional under those principles.

### B. The CTA Is Reasonable Under the "Special Needs" Exception.

Even if the Court were to analyze the CTA under cases applying a warrant requirement outside the context of reporting requirements (which it should not), the CTA falls within the "special needs" exception to such a requirement. *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 619 (1989); *see also id.* ("When faced with … special needs, we have not hesitated to balance the

governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context."). The CTA addresses a need "beyond the normal need for law enforcement," *id.*—that is, the advancement of U.S. national security and foreign policy interests, *see Klayman v. Obama*, 805 F.3d 1148, 1149 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc).

Congress enacted the CTA to "protect the national security of the United States." NDAA § 6002(5); *see also* 87 Fed. Reg. at 59,498 ("Recent geopolitical events have reinforced the threat that abuse of corporate entities, including shell or front companies, by illicit actors and corrupt officials presents to the U.S. national security …."). The CTA will "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards." NDAA § 6402(5); *see also* 87 Fed. Reg. at 59,499 ("U.S. efforts to collect BOI will lend U.S. support to the growing international consensus to enhance beneficial ownership transparency, and will spur similar efforts by foreign jurisdictions. At least 30 countries have already implemented some form of central register of beneficial ownership information, and more than 100 countries, including the United States, have committed to implementing beneficial ownership transparency reforms."). Courts have upheld warrantless information collection against Fourth Amendment challenge because of such special needs. *See Klayman*, 805 F.3d at 1149 (Kavanaugh, J., concurring in the denial of rehearing en banc) (concluding that a "critical national security need outweighs the impact on privacy" as to telephone metadata collection); *Stehney v. Perry*, 907 F. Supp. 806, 823 (D.N.J. 1995) (concluding that "the compelling interest in protecting national security outweighs whatever minor intrusion may be occasioned by a polygraph interview" in the context of background investigations).

Further, requiring FinCEN to obtain a warrant prior to gathering beneficial ownership information would be "impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 876 (1987). Contrary

to Plaintiffs' contention that there are no "time-sensitive or unusual variables in the CTA context," Pls.' Br., PageID.687, the Executive Branch must often act quickly to identify beneficial owners to prevent asset flight initiated by actors who can transfer funds instantaneously. *See* 87 Fed. Reg. at 59,504 ("The collection of beneficial ownership information at the time of company formation would significantly reduce the amount of time currently required to research who is behind anonymous shell companies, and at the same time, prevent the flight of assets and the destruction of evidence.").

## III. THE CTA DOES NOT VIOLATE THE FIFTH AMENDMENT.

Plaintiffs' cursory argument that the CTA is unconstitutionally vague is meritless. "Unconstitutionally vague statutes are those that are not subject to reasonable interpretation." *United States v. Cunningham*, 2021 WL 4864301, at *3 (E.D. Mich. Oct. 19, 2021). "[T]he degree of vagueness that the Constitution tolerates … depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). A "scienter requirement … mitigates the statute['s] alleged vagueness." *United States v. Charczenko*, 1995 WL 7961, at *2 (6th Cir. Jan. 9, 1995); *see also United States v. Hescorp*, 801 F.2d 70, 77 (2d Cir. 1986) ("[A] requirement of willfulness makes a vagueness challenge especially difficult to sustain."). And where the law does not "restrict[] constitutionally protected actions, like freedom of speech or association … a less onerous test applies." *United States v. Anvari-Hamedani*, 378 F. Supp. 2d 821, 830 (N.D. Ohio 2005); *see also Hoffman Estates*, 455 U.S. at 499 (similar). The CTA is subject to substantially reduced vagueness scrutiny under these precedents: Plaintiffs do not allege that it restricts protected First Amendment activity, and its penalty provisions include scienter requirements, *see* 31 U.S.C. § 5336(h)(1) (willfulness); *id.* § 5336(h)(6) ("In this subsection, the term 'willfully' means the voluntary, intentional violation of a known legal duty").

The CTA easily survives such vagueness scrutiny. Plaintiffs challenge the CTA's

definition of "beneficial owner," to the extent it includes those who, through any "understanding, relationship, or otherwise," exercise "substantial control over the entity." 31 U.S.C. § 5336(a)(3)(A)(i). The plain text of the "beneficial owner" definition allows ordinary people to understand what the law requires: reporting companies must report individuals who exert substantial control over the company. Courts have repeatedly concluded that similar statutory terms are capable of reasonable interpretation. *See United States v. Flores*, 63 F.3d 1342, 1373 (5th Cir. 1995) (rejecting argument "that the term 'substantial' is vague" and concluding that a "'substantiality' requirement is frequently encountered and readily understood"); *Ill. One News, Inc. v. City of Marshall*, 477 F.3d 461, 466 (7th Cir. 2007) ("[T]he use of 'substantial' does not make a definition intolerably vague."); *United States v. Re*, 336 F.2d 306, 316 (2d Cir. 1964) (rejecting argument that "control" was "unconstitutionally vague and indefinite"). And because the CTA's willfulness provision conditions penalties on a "voluntary, intentional violation of a known legal duty," 31 U.S.C. § 5336(h)(6), "[o]n no construction can the statutory provisions here involved become a trap for those who act in good faith," *United States v. Ragen*, 314 U.S. 513, 379 (1942).

Federal regulations provide significant additional guidance. *See* 31 C.F.R. § 1010.380(d)(1) (providing a "[d]efinition of substantial control"); *see also Hoffman Estates*, 455 U.S. at 494 n.5 ("In evaluating a facial challenge … a federal court must, of course, consider any limiting construction that a[n] … enforcement agency has proffered."). Plaintiffs' contention that the regulations "define 'substantial control' as meaning 'substantial control,'" Pls.' Br., PageID.706, misses the mark. Section 1010.380(d)(1)(i) defines "substantial control" as being "a senior officer of the reporting company," having "authority over the appointment or removal of any senior officer or a majority of the board of directors," having sufficient "influence over important decisions made by the reporting company," and—Plaintiffs' gripe—"any other form of

substantial control." 31 C.F.R. § 1010.380(d)(1)(i).  Backstop "otherwise" clauses such as this are commonplace in federal law, and courts regularly find them capable of reasonable interpretation under traditional principles of construction.  *See, e.g.*, *Fischer v. United States*, 603 U.S. ---, 2024 WL 3208034, at *4 (U.S. June 28, 2024) (interpreting "the scope of the residual 'otherwise' clause" in criminal obstruction of justice statute by looking to "how the residual clause is linked to its surrounding words" (quotation omitted)).

Plaintiffs cannot further their cause by pointing to hypothetical scenarios, such as the statute's application to a "clerk who works in the law firm's mailroom."  Pls.' Br., PageID.706-07.  "[I]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."  *United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2001) (quotation omitted).  Plaintiffs "bear[] the burden of establishing that the statute is vague as applied to [their] particular case, not merely that the statute could be construed as vague in some hypothetical situation."[14]  *Id.*; *see also Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.").  The Supreme Court's decision in *Johnson v. United States*, 576 U.S. 591 (2015), on which Plaintiffs rely, is not to the contrary.  *Johnson* did not "address, let alone question, the indelible rule that a defendant whose *own* conduct is clearly prohibited by a penal statute cannot pose a facial challenge to the statute."  *United States v. Morales-Lopez*, 92 F.4th 936, 943 (10th Cir. 2024); *see also United States v. Kimbrough*, 319 F. Supp. 3d 912 (M.D. Tenn. 2018) (similar).

Plaintiffs do not show that the definition of "beneficial owner" under the CTA is vague as

---

[14] In any event, the statute's definition of "applicant" clearly does apply to anyone who "files" the formation documents, whether mailroom clerks or otherwise, 31 U.S.C. § 5336(a)(2)—a fact that has nothing to do with the statute's definition of "beneficial owner," *id.* § 5336(a)(3).  Plaintiffs' real gripe appears to be a policy disagreement about whether Congress *should* have written the CTA to cover such persons, not legitimate uncertainty about whether it *did*.

applied to facts of this case. Their facial vagueness challenge therefore fails.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

Dated:  July 8, 2024                                        Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director

*/s/ Christian S. Daniel*
CHRISTIAN S. DANIEL
MICHAEL J. GAFFNEY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 514-5838
Email: christian.s.daniel@usdoj.gov

*Counsel for Defendants*