UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SMALL BUSINESS ASSOCIATION
OF MICHIGAN, et al.,

        Plaintiffs,

v.                                           CASE No. 1:24-cv-314

                                               HON. ROBERT J. JONKER

JANET YELLEN, et al.,

        Defendants.

_____/

## OPINION AND ORDER

### INTRODUCTION

Plaintiffs are a mix of Michigan non-profits, Michigan limited liability companies, and individual Michigan business owners.  They sue to challenge the Corporate Transparency Act on multiple constitutional fronts, including the Fourth Amendment.  They claim that the Act's reporting requirements operate as an unreasonable search in violation of the Fourth Amendment. The Court agrees.  The CTA may have good intentions but the road it chooses to pursue them paves over all reasonable limits.  The CTA's reporting requirements reach indiscriminately across the smallest players in the economy to extract and archive a trove of personal data explicitly for future law enforcement purposes at an expected cost to the reporting players of almost $22 billion in the first year alone.  The Fourth Amendment prohibits such an unreasonable search.

### FACTUAL AND PROCEDURAL BACKGROUND

The sands continue to shift as multiple federal courts weigh in on the Corporate Transparency Act ("CTA").  Some district courts, including this one, have denied preliminary injunctive relief on various grounds.  *See Firestone v. Yellen*, No. 3:24-cv-1034-SI, 2024 WL 4250192 (D. Or. Sept. 20, 2024); *Cmty. Ass'ns Inst. v. Yellen*, No. 1:24-cv-1597 (MSN/LRV), 2024 WL 4571412 (E.D. Va. Oct. 24, 2024).  Others have enjoined the CTA's enforcement against some of the same defendants here (*National Small Business United v. Yellen*, No. 5:22-cv-1448-LCB, 2024 WL 899372 (N.D. Ala. Mar. 1, 2024)), as well as against others with varying scopes of relief (*Texas Top Cop Shop, Inc. v. Garland*, No. 4:24-CV-478, 2024 WL 5049220 (E.D. Tex. Dec. 5, 2024) (enjoining enforcement of CTA on a nationwide basis); *see also Smith v. United States Dep't of the Treasury*, No. 6:24-CV-336-JDK, 2025 WL 41924 (E.D. Tex. Jan. 7, 2025) (enjoining enforcement of the CTA against only the named plaintiffs but staying the effective date of the Reporting Rules for everyone "while this lawsuit is pending")).

After the Eastern District of Texas refused to stay its *Top Cop* nationwide injunction (*Texas Top Cop Shop, Inc. v. Garland*, No. 4:24-CV-478, 2024 WL 5145951 (E.D. Tex. Dec. 17, 2024)), the Fifth Circuit granted a stay (*Texas Top Cop Shop, Inc. v. Garland*, No. 24-40792, 2024 WL 5203138 (5th Cir. Dec. 23, 2024)), which it vacated three days later on an emergency rehearing (*Texas Top Cop Shop, Inc. v. Garland*, No. 24-40792, 2024 WL 5224138 (5th Cir. Dec. 26, 2024)).  The Supreme Court has since stayed the *Top Cop* injunction pending disposition of the Fifth Circuit appeal.  *McHenry v. Texas Top Cop Shop, Inc.*, 145 S. Ct. 1 (2025).  The Eastern District of Texas thereafter stayed its preliminary injunction against the Reporting Rules in *Smith*.  No. 6:24-CV-336-JDK, ECF No. 39 (Feb. 17, 2025).  This removed any judicial barrier to operation of the CTA.

As of this writing, Treasury itself has postponed the deadline for most reporting companies to March, 21, 2025.[1]  The Financial Crimes Enforcement Network ("FinCEN") has also announced that it "will not issue any fines or penalties or take any other enforcement actions against any companies based on any failure to file or update beneficial ownership information (BOI) reports" until a forthcoming interim final rule takes effect.[2]  In addition, Treasury has announced that it will "not enforce any penalties or fines against U.S. citizens or domestic reporting companies or their beneficial owners after the forthcoming rule changes take effect."[3]  These actions are not a matter of record, do not carry the force of law, and do not moot this case.  The Court now addresses the Fourth Amendment issues for the parties in the case and concludes that Plaintiffs are entitled to judgment as a matter of law declaring the CTA Reporting Rules a violation of the Fourth Amendment and enjoining operation of the CTA as to Plaintiffs and their members in the case.

## I.    The Corporate Transparency Act

The CTA is the federal government's response to alleged gaps in its anti-money laundering and counterterrorism regime.  The premise of the CTA is that the opacity of the ownership of millions of small corporations and limited liability companies formed under the laws of the fifty states each year facilitates criminal activity.  The CTA therefore establishes an expansive repository of ownership information to unmask these owners in aid of nationwide law enforcement efforts.  An estimated 32.6 million existing entities and 5 million new entities formed each year from 2025 to 2034 are expected to fall within the CTA's ambit.  *Beneficial Ownership Information*

---

[1] *See* FinCEN Notice, *FinCEN Extends Beneficial Ownership Information Reporting Deadline by 30 Days; Announces Intention to Revise Reporting Rule* (Feb. 18, 2025).

[2] FinCEN Notice, *FinCEN Not Issuing Fines or Penalties in Connection with Beneficial Ownership Reporting Deadlines* (Feb. 27, 2025).

[3] Treasury Press Release, *Treasury Department Announces Suspension of Enforcement of Corporate Transparency Act Against U.S. Citizens and Domestic Reporting Companies* (Mar. 2, 2025).

*Reporting    Requirements*,    87   Fed.    Reg.    59498,    59549   (Jan.    1,    2024), https://www.federalregister.gov/d/2022-21020/p-639 [https://perma.cc/XY4M-FT6Z].

Passed as part of the National Defense Authorization Act for Fiscal Year 2021, the CTA is one of many provisions of the Anti-Money Laundering Act of 2020 ("AMLA"). *See* Pub. L. No. 116-283, 134 Stat. 3388, §§ 6401–03 (CTA codified as amended at 31 U.S.C. § 5336) (2021). One of the AMLA's objectives is to "establish uniform beneficial ownership information reporting requirements." *Id.* at Div. F, § 6002, 134 Stat. 4547 (2021). These reporting requirements aim to "improve transparency for national security, intelligence, and law enforcement agencies and financial institutions concerning corporate structures," "discourage the use of shell corporations as a tool to disguise and move illicit funds," "assist national security, intelligence, and law enforcement agencies with the pursuit of crimes," and "protect the national security of the United States." *Id.* To this end, the AMLA calls for the creation of "a secure, nonpublic database at FinCEN." *Id.*

Under the CTA, a "reporting company" must submit to FinCEN a report containing the name, date of birth, address, and identification document (such as a passport or state I.D.) of each of that company's "beneficial owners." 31 U.S.C. § 5336(b). Reports must be submitted directly to FinCEN's E-Filing system. A "reporting company" is a "corporation, limited liability company, or other similar entity that is (i) created by the filing of a document with a secretary of state or similar office under the law of a State or Indian tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States." *Id.* § 5336(a)(11)(A). Excluded from this definition are twenty-three entity types, including governmental bodies, certain financial entities, insurance companies, and entities with more than 20 employees and more than $5 million in gross receipts. *Id.* § 5336(a)(11)(B); *see also* 31 C.F.R. § 1010.380(c)(2). In other words, the

exempt businesses are the biggest players in the economy, and the target businesses are the small and entrepreneurial companies like those bringing this action.

A "beneficial owner" is "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." *Id.* § 5336(a)(3)(A).  The Department of the Treasury's final rule implementing the reporting requirement (the "Reporting Rule") further explains that an individual exercises substantial control over a reporting company when she "(A) Serves as a senior officer of the reporting company; (B) Has authority over the appointment or removal of any senior officer or a majority of the board of directors (or similar body); (C) Directs, determines, or has substantial influence over important decisions made by the reporting company." *Id.* § 1010.380(d)(1).  Anyone and everyone who falls within one of these broad categories of "beneficial owner" must provide their name, date of birth, address, and approved identification document to FinCEN's central repository in what can only be described as a massive data compilation worthy of Orwell's "Big Brother."

The Reporting Rule also provides that any reporting company created on or after January 1, 2024, must file an initial report with FinCEN after its creation becomes effective with a secretary of state, and that a reporting company created before January 1, 2024, shall have until January 1, 2025, to file such a report.  31 C.F.R. § 1010.380(a)(1)(i)–(iii).[4]  The Reporting Rule not only creates an initial "Big Brother" database but also requires filers to provide updated reports within 30 days when "there is any change with respect to required information previously submitted."  31 C.F.R. § 1010.380(a)(2).  Like the initial reports, updates must include each beneficial owner's

---

[4] As of this writing, FinCEN has extended the effective date to March 21, 2025, which may be further extended, or even suspended, by the forthcoming interim final rule.  *See supra*, at n.2–3.

full legal name, date of birth, address, identifying number, and an image of the document from which the identifying number was obtained.  *Id.* § 1010.380(b)(1)(ii).

The CTA imposes penalties for willful noncompliance, including civil penalties of $500 per day, or criminal penalties that could include fines of up to $10,000, imprisonment of up to two years, or both.  31 U.S.C. § 5336(h)(1), (3).  A criminal violation amounts to a felony.

The central FinCEN database is supposed to be secure and non-public, though it is now common knowledge that both government and private data collections are regularly hacked or reviewed by unauthorized persons.  The CTA itself does authorize some disclosures.  Specifically, FinCEN may share private information from the database upon receipt of a request from federal or state law enforcement agencies, or upon a request from a federal agency on behalf of a foreign law enforcement agency, prosecutor, or judge of another country under an applicable international treaty, agreement, convention or official request.  *Id.* § 5336(c).  In other words, "Big Brother" has permission to provide the archived information to law enforcement to support criminal investigations and prosecution.

FinCEN estimates the initial cost of compliance for the private sector to be about $21.7 billion nationally in the first year and then $3.3 billion more each year afterward.  *See Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. at 59573 (Jan. 1, 2024), https://www.federalregister.gov/d/2022-21020/p-958 [https://perma.cc/7CXL-49G2].  This means every targeted small business covered by the CTA could incur an initial compliance cost of as much as $2,500.  *Id.*

## II.    Plaintiffs Small Business Association of Michigan, et al.

There are seven plaintiffs to this action: two organizational plaintiffs, three individual "reporting company" plaintiffs, and two individual "beneficial owner" plaintiffs.

### A.  Organizational Plaintiffs

The organizational plaintiffs consist of the Small Business Association of Michigan ("SBAM") and the Chaldean American Chamber of Commerce ("CACC").  SBAM is a Michigan non-profit organization with its principal place of business in Lansing, Michigan.  (ECF No. 1, PageID.8 ("Compl.") at ¶ 13).  SBAM's members comprise more than 30,000 small businesses registered to do business in Michigan.  (*Id.* at ¶ 14).  SBAM claims to have devoted substantial time and money to educating its member businesses about the CTA.  (*Id.* at ¶¶ 17, 23).  CACC is likewise a Michigan non-profit organization, with its principal place of business in Farmington Hills, Michigan.  (*Id.* at ¶ 25).  Like SBAM, CACC advocates for and promotes small businesses, focusing on those in the Chaldean American community.  (*Id.* at ¶ 26).  Also like SBAM, CACC alleges to have committed resources to educating its over 4,000 member businesses about compliance with the CTA.  (*Id.* at ¶¶ 26–27).

### B.  Individual "Reporting Company" Plaintiffs

The individual "reporting company" plaintiffs are threefold: Steward Media Group, LLC; Power Connections Co, LLC; and Semper Real Estate Advisors, LLC.  Each are "reporting companies" under the CTA and each are members of SBAM.  (*Id.* at ¶¶ 28–29, 31).  Steward Media Group and Power Connections Co are also members of CACC.  (*Id.* at ¶¶ 28–29).  None have made the disclosures required under the CTA.  (*Id.* at ¶¶ 28–29, 31).  Steward Media Group was formed on February 24, 2011, giving it a reporting deadline of January 1, 2025.  (*Id.* at ¶ 28).  The reporting deadlines for Power Connections Co and Semper Real Estate Advisors have come and gone.  Both were formed after January 1, 2024, triggering the more immediate reporting deadlines under the CTA.  (*Id.* at ¶¶ 29, 31).

### C.  Individual "Beneficial Owner" Plaintiffs

Finally are the two individual "beneficial owner" plaintiffs: Derek Dickow and Timothy Eisenbraum.  Dickow owns a membership interest in Power Connections Co and Steward Media Group, both of which are subject to the CTA's reporting requirements.  (*Id.* at ¶ 30).  Eisenbraum owns a membership interest in Semper Real Estate Advisors, which is also a "Reporting Company" under the CTA.  (*Id.* at ¶ 32).  Both Dickow and Eisenbraum object to the disclosure of their information under the CTA generally and "for long-term storage in FinCEN's law-enforcement database."  (*Id.* at ¶¶ 30, 32).

## III.    Procedural History

On March 26, 2024, Plaintiffs brought this action seeking a preliminary injunction enjoining Defendants from enforcing the CTA against them.  (ECF No. 1).  After Plaintiffs' motion for preliminary injunction was fully briefed, the Court heard argument on April 26, 2024.  (ECF No. 23).  Although finding some "genuinely tough problems with the CTA as it's written," the Court denied the motion from the bench.  (ECF No. 25, PageID.644).  Citing the then-distant compliance date of January 1, 2025 for all but two plaintiffs, the delay in bringing suit, and the fact that, through this action, Plaintiffs put into the world the same information they object to disclosing under the CTA, the Court found no irreparable harm.  (*Id.* at PageID.644–46).  On the merits, the Court was not yet prepared to declare a probability of success but acknowledged lingering questions about the limits of Congress' enumerated powers.  (*Id.* at PageID.647–48).  The Court noted that the Fourth Amendment challenge brought Plaintiffs the closest to a probability of success in light of the "mass of data" that the CTA would place "on the shelf for law enforcement purposes."  (*Id.* at PageID.648–49).  Ultimately, the Court asked the parties to help clarify the Fourth Amendment lines for summary judgment purposes.  (*Id.*).

And indeed, just days later on May 31, 2024, Plaintiffs moved for summary judgment. (ECF No. 26).  The government likewise moved for summary judgment in a cross motion on July 8, 2024.  (ECF No. 30).  The motions were fully briefed by August 9, 2024, and the Court heard argument on the motions on December 16, 2024.  (ECF No. 41).

As detailed above, there have been several legal developments in the intervening months. Courts have denied and granted preliminary injunctive relief, at least one court has granted the government summary judgment on Article I grounds (*Boyle, v. Bessent, et al.*, No. 2:24-CV-00081-SDN, 2025 WL 509519, at *17 (D. Me. Feb. 14, 2025)), and appeals from several of these decisions are pending before the Fourth, Fifth, Ninth, and Eleventh Circuits.  Thus far, much of the focus has been on the enumerated powers challenges to the CTA.  This Court takes a different approach and examines the CTA through a Fourth Amendment lens.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  FED R. CIV. P. 56(a).  At the summary judgment stage, "[t]he ultimate question . . . is whether the evidence presents a sufficient factual disagreement to require submission of a particular legal claim to the jury, or whether the evidence is so one-sided that [the moving party] should prevail as a matter of law."  *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 748–49 (6th Cir. 2012).  The same governing standard applies when—as here—the parties file cross-motions for summary judgment.  *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016).

## THE FOURTH AMENDMENT

The Fourth Amendment provides: "The right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. CONST. AMEND. IV.   A Fourth Amendment search occurs "when the government physically intrudes upon one of these enumerated areas, or invades a protected privacy interest, for the purpose of obtaining information." *Patel v. City of Los Angeles*, 738 F.3d 1058, 1061 (9th Cir. 2013) [hereinafter *Patel I*], *aff'd sub nom. City of Los Angeles, Calif. v. Patel*, 576 U.S. 409 (2015) [hereinafter *Patel II*] (citing *United States v. Jones*, 565 U.S. 400, 404–07 (2012); *Katz v. United States*, 389 U.S. 347, 360–61 (1967) (Harlan, J., concurring)).

If the CTA's compelled disclosure is a "search" under either a property- or privacy-based Fourth Amendment approach, the next question is whether that search is reasonable.  While a warrant is generally required to conduct a search, the "ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  The Supreme Court case of *California Bankers Association v. Shultz*, 416 U.S. 21, 67 (1974) sets forth the reasonableness standard for reporting requirements like those imposed by the CTA.  It requires the information sought to be (i) "sufficiently described," (ii) "limited in nature," and (iii) "sufficiently related to a tenable congressional determination as to improper use of [the corporate form] in interstate commerce."  *Id.*

### DISCUSSION

The data the CTA compels is commercially sensitive and historically private.  Like many other states, Michigan does not require the beneficial ownership information ("BOI") as a condition of obtaining authorization to operate as a corporation or LLC.  So the CTA is compelling individuals to provide information never disclosed to the states.  Plus, in addition to just the raw information found in corporate papers, the CTA requires judgments about the meaning of who is exercising "substantial control" over the entity and is therefore a "beneficial owner."  And the

CTA then correlates personally identifying data about individuals with these judgments, receives constant updating, and stores it all indefinitely for disclosure at the request of state and federal law enforcement who claim to need it for criminal investigation or prosecution.  In the Court's view, this massive collection of personally identifying data for law enforcement, costing providers billions of dollars, amounts to an unreasonable search in violation of the Fourth Amendment.

> **I.    The CTA's Compelled Disclosure Amounts to a "Search."**

Modern Fourth Amendment jurisprudence recognizes two approaches to determine whether a "search" has occurred.  The first is the property-based approach of *Jones*, which asks whether the government physically intrudes upon a constitutionally protected area with the intent to obtain information.  *Jones*, 565 U.S. at 406 n.3.  The second, privacy-based approach articulated in *Katz* asks whether the government invades a constitutionally protected privacy interest to gather information.  *Katz*, 389 U.S. at 360–61.  This means that the plaintiff must have a subjective expectation of privacy that "society is prepared to recognize as reasonable."  *Smith v. Maryland*, 442 U.S. 735, 740 (1979).

The Court finds both the property and privacy interests here sufficient to implicate the Fourth Amendment.  The property, Plaintiffs' BOI, is among the Amendment's enumerated "papers" and "effects."  *See Hale v. Henkel*, 201 U.S. 43, 76–77 (1906).  The compelled production of corporate papers, or compilations of information in those papers, at pain of civil or criminal penalties, is tantamount to a physical intrusion on Plaintiffs' private commercial property.  *See Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 482 (S.D.N.Y. 2019) ("[I]n a series of cases, the Supreme Court has recognized that governmental demands for the production of papers in which the holder has a protected privacy interest also implicate the Fourth Amendment, with some cases deeming such compulsory legal process to work a 'constructive search.'") (collecting cases). The papers at issue here are not simply the publicly available certificates of formation of a

11

corporation or LLC, but the private agreements between individuals that describe who owns or controls what within the organizations.  It is from these private papers that individuals will have to form the judgment calls implicit in disclosing who is a "beneficial owner" under the definition of the CTA and its implementing regulations.  Plaintiffs have a possessory and ownership interest in these records, including the right to exclude "trespassers" under *Jones*.

The plaintiffs' privacy interest in these records is also legitimate and well-established.  As the text of the CTA confirms, "most or all States do not require information about the beneficial owners of the corporations, limited liability companies, or other similar entities formed under the laws of the State."  Pub. L. No. 116-283, 134 Stat. 4604, § 6402 (2021).  Businesses and their owners therefore do not "ordinarily disclose," nor are they "expected to disclose," their BOI.  *Patel I*, 738 F.3d at 1062.  The Act was conceived, of course, because these private business records cannot be found in the public domain.  Nor is there any other local, state, or federal law mandating beneficial owner disclosure directly to the government.  And, with one exception,[5] the targeted information does not exist in the form requested, meaning the reporting agent needs to create it.  It makes no difference that the identification documents the CTA seeks are quasi-public or government-issued.  In isolation, an identifying document is just a way of confirming personal identity.  Here, the CTA requires not merely an identity, but a larger story of beneficial ownership associated with that identity that has not previously been subject to forced government disclosure.

---

[5] FinCEN's Customer Due Diligence ("CDD") Requirements for Financial Institutions require covered financial institutions to collect identification information for the identity of beneficial owners of legal entity customers when a new account is opened.  A "legal entity customer" is a corporation, limited liability company, or other entity that is created by the filing of a public document with a Secretary of State or similar office, a general partnership, and any similar entity formed under the laws of a foreign jurisdictions that opens an account. 31 C.F.R. § 1010.230(e). Because the CTA and CDD collect slightly different BOI, the CTA has mandated that the Secretary of the Treasury revise the CDD Requirements to bring them into conformance with the CTA and to "reduce any burdens on financial institutions and legal entity customers that are, in light of the enactment of [the CTA], unnecessary or duplicative." 31 U.S.C. § 5336(d)(1).

The CTA may well have good reason to wish it were otherwise, but the history and tradition of unintrusive state laws has given Plaintiffs every reason to expect privacy in their BOI.

The nature of the required information also supports a reasonable expectation of privacy. Required to be disclosed under the CTA are the identities of an entity's beneficial owners, and, by extension, the structure of its internal power dynamics. The government argues that these disclosures reveal only the "beneficial owners," not the nature or extent of each owner's interest. But the mere designation of "beneficial owner" reveals a closely guarded fact that private companies keep from competitors and within company walls. *Katz,* 389 U.S., at 351–352 ("what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected"). And once disclosed, this information does not sit in a vacuum; it composes a centralized, indexable database that paints an even fuller picture. "With just the click of a button, the Government can access each [reporting company's] deep repository of [ownership] information at practically no expense." *Carpenter v. United States*, 585 U.S. 296, 311 (2018). The CTA, in other words, places in the hands of government officials and special government employees large volumes of personally identifiable information and commercially sensitive data. Privacy interests abound.[6]

The landing page for FinCEN's BOI website, which contains a warning to reporting companies about fraudulent attempts to solicit BOI, is further illuminating. *Beneficial Ownership Information*, FinCEN, https://www.fincen.gov/boi (last updated Feb. 19, 2025)

---

[6] The technologies of the modern era continue to alter the Fourth Amendment landscape, and courts must adapt as privacy implications evolve. This includes paying attention to the predictive power of mass data. *See, e.g.*, Yaqub Chaudhary & Jonnie Penn, *Beware the Intention Economy: Collection and Commodification of Intent via Large Language Models*, HARVARD DATA SCIENCE REVIEW, (Special Issue 5) (Dec. 30, 2024). Data compilations of the size and scope envisioned by the CTA have potential to predict individual behavior and patterns well beyond the information literally archived in the database, something the largest online retailers demonstrate daily with business models that depend on the predicative power of big data.

[https://perma.cc/T6TH-G8KY].  The page cautions readers to "[n]ever give personal information, including regarding beneficial ownership to anyone unless you trust the other party."  *Id.*  Implicit in this warning, in the scams themselves, and in the Act's statutory safeguards against information sharing, is a recognition that the CTA's compelled information is sensitive and private.  The government itself, then, acknowledges the privacy interest of citizens in this data.

The government argues that the commercial entity plaintiffs have a diminished expectation of privacy in their records.   Commercial entities do have weaker Fourth Amendment rights than people.  *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) ("corporations can claim no equality with individuals in the enjoyment of a right to privacy").  But even a diminished right to privacy still has some protections, including against "fishing expeditions into private papers on the possibility that they may disclose evidence of crime."  *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 305–06 (1924).   And here the information required is not simply about the commercial entity but about each entity's beneficial owners, who are people after all.  The personal identity required is not of an entity or robot; it is of a flesh-and-blood human being.

It bears emphasis that the CTA is a stick, not a carrot.  It carries the threat of a felony conviction and steep civil and criminal penalties for noncompliance.  31 C.F.R. § 5336(h)(1)–(2).  This, combined with the natural reticence to disclose private information to the government, risks chilling core associational freedoms, including ownership in a private company.  As cemented in the landmark case of *NAACP v. Button*, 371 U.S. 415, 430 (1963), the Supreme Court has "refused to countenance compelled disclosure of a person's political associations."  Given the CTA's wide reach, it most certainly compels disclosure of the plaintiffs' private associations, be they political, religious, commercial, or otherwise.  *Button*'s antipathy for such an inhibitory statutory effect reinforces the privacy rights at issue here.

14

The government has also argued—at least during the preliminary injunction hearing—that individual citizens do not have *any* privacy interest in the information compelled under the CTA. (*See* ECF 25, PageID.628).  It seems to have softened that position to some degree in its summary judgment briefing, stating that "Plaintiffs lack a material, concrete privacy interest" in their names, dates of birth, addresses, and unique identifying numbers.[7]  (ECF No. 31, PageID.782).  Its strongest case on this point is *United States v. Miller*, 425 U.S. 435 (1976), the Supreme Court's seminal third-party doctrine case.  *Miller* asked whether a bank depositor had a reasonable expectation of privacy in his bank records compelled by the Bank Secrecy Act ("BSA").  *Id.* at 441.  The answer, the Court determined, is "no."  It reasoned that all of the depositor's documents "contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business."  *Id.* at 442.  They were, in other words, voluntarily disclosed to a third party (the bank) in furtherance of a series of public transactions.  But that is not what we have with the CTA.  The CTA requires disclosure directly from the plaintiffs to the government, not to a banker or other private business with whom the plaintiffs want to do business.  Moreover, what the plaintiffs have to provide the government is information they have not had to disclose to anyone else, including the state, before enactment of the CTA.  This is also the key distinction between the CTA and the CDD beneficial owner requirements, discussed *supra*, at n.5.

The Court is therefore convinced as a matter of law that the plaintiffs have a reasonable expectation of privacy in the compilation of information the CTA requires them to provide the

---

[7] The Court again rejects the government's framing.  The question is not simply whether the individual plaintiffs have a reasonable expectation of privacy in their personally identifiable information, but whether they have a reasonable expectation of privacy in that information as a means of identifying their beneficial ownership interests in the legal entities, which is something the individual plaintiffs have not previously been compelled to provide to any governmental entity at the local, state, or federal level.

government.  The next question, then, is whether the search satisfies the Fourth Amendment's reasonableness standard.

## II.    The Search is Unreasonable.

The burden now shifts to the government to establish the reasonableness of the search. *Taylor v. City of Saginaw, Michigan*, 11 F.4th 483, 489 (6th Cir. 2021).  Outside of the strictures of the warrant and probable-cause requirements, "reasonableness" is the controlling test.  And it's a demanding test for the government to meet.  Searches conducted without prior approval by a judge "'are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant,* 556 U.S. 332, 338 (2009) (quoting *Katz,* 389 U.S. at 357).  This rule "applies to commercial premises as well as to homes." *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312 (1978).  The express purpose of the CTA is to assist criminal law enforcement, so the administrative search exception to the warrant requirement does not apply; rather, the ordinary balancing between "the need to search against the invasion which the search entails" controls. *Camara v. Mun. Court,* 387 U.S. 523, 537 (1967).  The government must therefore show why its need outweighs the invasion.

As Judge Lynch aptly wrote when sitting by designation on the Second Circuit in *Nicholas v. Goord*, "[c]ategorical rules are helpful because an unbounded ad hoc judgment of the 'reasonableness' of governmental action will often tempt judges to uphold actions that, particularly with the benefit of hindsight, prove valuable in accomplishing social goals."  430 F.3d 652, 678 (2d Cir. 2005) (Lynch, J., concurring).  So, precedence guides.  And here, the Supreme Court's leading case on the application of the general reasonableness test to reporting requirements arguably similar to the CTA is *California Bankers Association v. Shultz*, 416 U.S. 21 (1974).  The government rests nearly all of its weight on *Shultz*, arguing that the CTA passes its "sufficiently described" and "limited" test for suspicionless reporting requirements.  (ECF No. 31, PageID.787).

The case certainly has significance, but in the Court's view, that significance is in highlighting the protections baked into the BSA that are not part of the CTA, all of which explain why the BSA satisfies the Fourth Amendment, but the CTA does not.

*Shultz* upheld the BSA's reporting requirements, which compelled banks to disclose the name, address, and social security number of persons making transactions exceeding $10,000. *Shultz*, 416 U.S. at 67. The reporting requirements, the Court held, passed Fourth Amendment muster because Congress had found the compelled information highly useful "in criminal, tax, or regulatory investigations." *Id.* at 26. A few features of the BSA's reporting requirements gave the Court comfort in its holding. For one thing, the reported information was limited to "commercial transactions," representing the real hotbed of illicit activity. *Id.* at 62. And not just any transactions; transactions of more than $10,000. This limitation, as Plaintiffs point out (*see* ECF No. 33, PageID.814), was crucial to Justices Powell and Blackmun in concurring with the majority. *Shultz*, 416 U.S. at 78 (Powell, J., and Blackmun, J., concurring) ("The implementing regulations, however, require only that the financial institution 'file a report on each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a *transaction in currency of more than $10,000*.'") (italics in concurrence). Only with these parameters in mind was the Court prepared to conclude that "[t]he regulations are sufficiently tailored so as to single out transactions found to have the greatest potential for such circumvention and which involve substantial amounts of money." *Id.* at 21.

The Court therefore formulated the following holding for the BSA's domestic reporting requirements:

> To the extent that the regulations in connection with such transactions require the bank to obtain information from a customer simply because the Government wants it, the information is **sufficiently described and limited in nature**, and **sufficiently related to a tenable congressional determination as to improper**

> **use of transactions of that type in interstate commerce**, so as to withstand the Fourth Amendment challenge made by the bank plaintiffs.

*Id.* at 67 (emphasis added).  It is this bolded language that the government now uses for its Fourth Amendment reasonableness test and its articulation of a limiting principle.  It argues that "[t]he information required to be reported under the CTA is 'sufficiently described' and 'limited'" in ways that are "strikingly similar" to the BSA.  (ECF No. 31, PageID.782).  For instance, says the government, like the BSA, the CTA also requires the disclosure of the relationship between the identity of bank customers and the covered transactions.  (*Id.* at PageID.782–83).  What's more, says the government, the CTA establishes safeguards to "protect the security and confidentiality" of reported information.  These are largely the same reasons other district courts have given in finding challengers unlikely to succeed on their Fourth Amendment claims.  *See, e.g.*, *Firestone*, 2024 WL 4250192, at *10–11; *Cmty. Associations Inst.*, 2024 WL 4571412, at *9.

The Court accepts the *Shultz* paradigm, but a proper application of the paradigm invalidates the CTA.  Consider all the ways the CTA differs from the BSA.  Start with the "sufficiently described" and "limited" transactional information the BSA seeks: specific transactions exceeding $10,000.  This test draws an unambiguous bright line at $10,000, sweeping into the reporting ambit only a fraction of all bank transactions that exceed the threshold.  Contrast what the CTA is after: all "beneficial owner" information, covering anyone who "exercises substantial control over the entity," whether "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise."  31 U.S.C. § 5336(a)(3)(A).  This applies for every "applicant," including anyone who "files an application to form a corporation, limited liability company, or other similar entity under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(2)(A).  The scope is essentially unlimited and in no way tries to home in on a subset of entities that, like the subset of high-dollar transactions, are more likely to trigger legitimate concerns.  Moreover, the

twenty-three exemptions the CTA does have are for the biggest players in the economy, meaning the focus of the CTA, by design, is on the smallest businesses least able to afford the eye-popping estimated cost of compliance.  What this amounts to is a broad, grab-everything collection of suspicionless data because some day, some way, somehow, someone in law enforcement might find it useful.  In this respect, the CTA fails the government's "sufficiently described" and "limited" test under *Shultz*.  *Cf. City of Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000) (checkpoint unconstitutional because "general interest in crime control" not a recognized justification for a regime of suspicionless stops).

Consider also that the BSA targets only the pervasively regulated banking industry, while the CTA makes no such distinction between the wide swath of businesses it governs.  "The clear import of our cases is that the closely regulated industry . . . is the exception."  *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978).  While banks do not fall under the four industries (liquor sales, firearms dealing, mining, or running an automobile junkyard) historically recognized as so heavily regulated that they enjoy *no* expectation of privacy, *Barlow's, Inc.,* 436 U.S., at 313, banks nevertheless operate under a "comprehensive scheme that puts [them] on notice that their property will be subject to periodic inspections undertaken for specific purposes."  *Patel II*, 576 U.S. at 425 (internal quotation marks and citations omitted).  From federal regulators like the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency to state agencies in whatever form they have taken over the years, banks and other financial institutions have been under constant supervision since long before the BSA.  From a privacy perspective, this places banks on materially different ground than small businesses that need only register at the state level and comply with the various tax and licensing obligations that apply generally across industries.  And it distinguishes banks from the hotels in *Patel II* that the Supreme Court deemed outside of the "closely regulated industry" exception.  *Patel II*, 576 U.S.

at 425 (regulations requiring hotels to "maintain a license, collect taxes, conspicuously post their rates, and meet certain sanitary standards" did not "establish a comprehensive scheme of regulation").  Thus, even if the CTA's reporting requirements were considered an administrative search, they would still contravene the Fourth Amendment.

Moreover, as discussed above, the BSA requires a bank-mediated report, while the CTA creates a direct reporting obligation.  As shown in *Miller*, the privacy interests change with the form of disclosure.  425 U.S. at 442.  A common refrain in the government's briefing is the statement from *Shultz* that "reporting requirements are by no means per se violations of the Fourth Amendment," and "a contrary holding might well fly in the face of the settled . . . history of self-assessment of individual and corporate income taxes in the United States."  *Shultz*, 416 U.S. at 59–60.  But finding these particular reporting requirements unconstitutional on these specific facts is far from making a categorical finding against all reporting requirements, which is what *Shultz* quite properly proscribes.  And the tax reporting example in *Shultz* is administrative; it's not done for criminal investigation purposes like the CTA.  As such, a Fourth Amendment ruling against the CTA is not only compatible with *Shultz*; it is a faithful application of its core rationale.

Existing law enforcement tools represent another strike against the CTA's reasonableness. Recall that the government already has a pathway to some BOI via the CDD reporting requirements once an entity decides to access the banking system.[8]  In its briefing, the government describes how the CDD "only applies to entities that choose to become customers of a

---

[8] As mentioned in Footnote 5, there are key differences between the two reporting requirements. Most importantly, the CDD—like the BSA—requires a bank-mediated report and not the same direct reporting obligation seen in the CTA.  This creates the same sort of third-party exception described in *Miller*, rendering the CTA's straight-to-the-source reporting requirement more intrusive.  Further distinguishing the two authorities are the triggering reporting events.  For the CTA, the creation or existence of the entity is all it takes to compel disclosure.  Whereas, for the CDD, the entity must create an account with a financial institution.  For these reasons, the BOI sought under the CTA is broader in scope than under the CDD.

comparatively narrow set of institutions and only requires those institutions to retain, but not transmit to the government certain customer information."  (ECF No. 31, PageID.773).  But that is more an argument for the plaintiffs than for the government.  If at least some of the BOI does, in fact, already exist for many of these commercial entities under the CDD reporting requirements, the government can obtain it if it can provide good reason for an administrative subpoena or warrant or some other pre-compliance approach that was already approved in *Miller*.  Moreover, if the aim of the CTA is to plug a gap in investigating money laundering and other related problems, it is a much more tailored approach to focus on only those entities that access the financial system, much as the BSA focuses on the subset of transactions above $10,000.  When at least some of the BOI is readily available from already regulated entities that are likely to be the tools of the targeted nefarious actors, there is no reasonable need for the government to vacuum up massive amounts of data from the smallest players in the system and store all of it in an Orwellian "Big Brother" digital warehouse for later use by any law enforcement agency that asks.

The government also identifies the CTA's "statutory safeguards" for information sharing as a source of comfort.  Recent events, however, expose the fragility of such protections.  *See, e.g.*, *New York v. Trump*, No. 25 CIV. 1144, 2025 WL 435411, at *1 (S.D.N.Y. Feb. 8, 2025), *modified on clarification*, No. 25-CV-01144 (JAV), 2025 WL 455406 (S.D.N.Y. Feb. 11, 2025) (temporary restraining order enjoining "special government employees" from accessing confidential Treasury systems);  Aaron  Rupar  (@atrupar),  X.COM  (Feb.  10,  2025,  11:18  AM), https://x.com/atrupar/status/1888985960634888640?s=46    [https://perma.cc/F9VC-HMK6] ("Rep. Pete Sessions on DOGE accessing Americans' private information: 'They brought their own people in who broke into, so to speak, these databases.'").  No one—especially not Treasury, it seems—can ensure the collection of private data will remain exclusively in the hands of sworn law enforcement officers who ask for it.  This deluge of privacy litigation—no matter how the

cases eventually resolve on the merits—only confirms the general interest in securing private collections of information in this age of big data.  The frequent reports in the public press of hacking public and private databases reinforces the point.

Finally, the CTA's statutory safeguards are hardly airtight as written.  Although the reported information is generally considered "confidential and may not be disclosed" except as authorized by the CTA, 31 U.S.C. § 5336(c)(2)(A), FinCEN may disclose BOI after receiving a request "from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity," or to "a State, local, or Tribal law enforcement agency, if a court of competent jurisdiction . . . has authorized the law enforcement agency to seek the information in a criminal or civil investigation."  *Id.* § 5336(c)(2)(B)(i).  These are the keys to unlock the store of BOI, and they appear sufficiently vague to invite warrantless review from a host of qualifying federal agencies.  *Cf. Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 533 (1967) ("Broad statutory safeguards are no substitute for individualized review").

### III.    The Special Needs Exception Does Not Apply.

The Court also disagrees with the government that the CTA falls under the "special needs" exception to the warrant requirement.  This exception focuses on giving the government special latitude in certain exigent circumstances; it is not an invitation for an end run of normal Fourth Amendment protections that generally apply and limit government in its ongoing investigation of suspected criminal activity.  *City of Indianapolis v. Edmond* is instructive here.  531 U.S. 32.  In striking down a drug-interdiction checkpoint designed to detect "ordinary criminal wrongdoing," the Court explained:

> The Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route.  The exigencies created by these scenarios are far removed from the circumstances under which authorities might simply stop cars as a matter of course to see if there just happens to be a felon

> leaving the jurisdiction.  While we do not limit the purposes that may justify a checkpoint program to any rigid set of categories, we decline to approve a program whose primary purpose is ultimately indistinguishable from the general interest in crime control.

*Id.* at 44 (cleaned up).  So too here.  Far from "imminent," the financial terrorism and money laundering the CTA targets is prospective, unidentified, and amorphous.  The central register the CTA assembles is a general roadblock, not a tailored one.  Maybe the CTA would aid law enforcement in detecting and investigating these future and yet-to-be-identified financial crimes.  As FinCEN acknowledges, "the U.S. Government has tools capable of obtaining some BOI," the problem is "the time and cost required to successfully deploy them."  *Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. at 59504 (Jan. 1, 2024), https://www.federalregister.gov/d/2022-21020/p-93 [https://perma.cc/DRE8-6KKN].  But using that rationale to justify unrestricted collection of personal data would eliminate the Fourth Amendment, which is one of many Constitutional protections that safeguards citizens at the expense and inconvenience of the government.  That's the whole point of the Constitutional protections.  Creating a more efficient process for general crime control, without a "quantum of individualized suspicion," is not enough to justify a "special need" or "exigent circumstance." *Edmond*, 531 U.S. at 47.

Even if the government passed the threshold "special needs" step, it overlooks that the exception has *two parts* to the analysis.  It is true that the Court must first ask whether the search is justified by a special need beyond the ordinary need for normal law enforcement.  But even if the answer there is "yes," it must then proceed to the ultimate "reasonableness" test already traversed above.  *Nicholas*, 430 F.3d at 664.  So, the exception does not really serve as a backstop; it's just an argument in the alternative.  And, for reasons already described, the government fails to clear the hurdle of the reasonableness test here.

### IV.    Enumerated Powers and Fifth Amendment Challenges

Because the Fourth Amendment challenge alone supports summary judgment for the plaintiffs, and because whatever relief given under the Fourth Amendment will fully encompass any available on the challengers' other constitutional claims, the Court leaves the Article I and Fifth Amendment issues for another day, if necessary.  The Article I issues are well on their way to decision in several Circuits already.  As for any Fifth Amendment challenge, it would be better—possibly even essential to Article III jurisdiction—to assess such issues in the context of a specific and concrete enforcement effort, and there are currently no such efforts against any of these plaintiffs.  The Court therefore concludes it is not only unnecessary, but also imprudent, to consider the Article I and Fifth Amendment issues at this time.

### CONCLUSION

The Constitution generally, and the Bill of Rights in particular, are all about protecting citizens from the power of government.  Governmental power has a natural tendency to expand and encroach on the freedom and privacy of citizens.  That is true even when the government is pursuing goals—like crime investigation and prevention—that are worthy and important.  The Fourth Amendment is one of the key limits on government power that protects the legitimate privacy interests of citizens from unreasonable government intrusion.  In Orwell's *1984*, "Big Brother" had omnipresent telescreens everywhere—including every citizen's living room—that made sure nothing beyond a smuggled, hand-written diary was truly private.  The CTA doesn't go that far, to be sure, but it's a step in that direction.  It compels citizens to disclose private information they are not required to disclose anywhere else just so the government can sit on a massive database to satisfy future law enforcement requests.  It does so at a cost of billions of dollars to the citizens least likely to afford it.  It amounts to an unreasonable search prohibited by the Fourth Amendment.

**ACCORDINGLY, IT IS ORDERED** that:

1.    Plaintiffs' Motion for Summary Judgment (ECF No. 26) is **GRANTED** on Fourth

Amendment grounds; and

2.    Defendants' Motion for Summary Judgment (ECF No. 30) is **DENIED** for the same

reasons.

**IT IS SO ORDERED.**


Dated:  March 3, 2025                     /s/ Robert J. Jonker
                                          ROBERT J. JONKER
                                          UNITED STATES DISTRICT JUDGE